HAEUSSLER INVESTMENT COMPANY, Appellant, v. CHARLES W. BATES.

In Banc, December 30, 1924.

1. **SEWER DISTRICT:** Assessment According to Area. Apportionment of the cost of construction of a joint district sewer according to area is not open to objection, where the charter authorizing such assessment (which has the force and effect of a legislative act) definitely fixes such method of apportionment, leaving to the city

authorities only the mathematical ascertainment of the tax assessed against each of the pieces of property in the district.

2. ———: Boundaries: Fixed by Legislative Act: Notice.  Notice to property owners, before a district is laid off and its boundaries are definitely fixed for the purposes of special taxation to pay for a public improvement, is not required where the official body which establishes the district acts in a legislative capacity; such notice is required only when the official body acts in its judicial or administrative capacity.  The Legislature, or other body exercising legislative functions, such as a municipal assembly, may ascertain and determine, as a legislative act, without notice to or a hearing by property owners, the question whether benefits will accrue to them from the establishment of a joint sewer district, and also the propriety of establishing the district with designated boundaries for the purpose of levying special taxes against the property therein to pay the cost of the improvement.

3. ———: ———: ———: ———: Delegation of Power: St. Louis Charter.  The Legislature cannot delegate its purely legislative functions; it may confer upon certain officers, boards, commissions or courts power to carry out the legislative will by ascertaining facts upon which the operation of the legislative act will depend, and in such case the officers or court upon whom such duties are laid act in an administrative or judicial capacity, and notice to property owners affected by the establishment of a taxing district is required; but the power exercised by the Municipal Assembly of St. Louis to establish a sewer district is not delegated by the Legislature, but is derived from the Constitution, which authorizes the city to frame a charter for its own government, and no provision of such a charter loses its effective force unless it is inconsistent with the Constitution or some general law enacted by the Legislature.  Under its charter the Municipal Assembly has power, without notice to or a hearing by the owners of private property in the district, to enact an ordinance establishing a joint sewer district, and such an ordinance is in no sense the exercise of legislative authority delegated to the city by the General Assembly.

4. ———: ———: ———: Upon Recommendation of Board: Restriction Upon Legislative Power.  The full legislative power of the Municipal Assembly of St. Louis to lay off a joint sewer district is not restricted by a charter provision requiring the movement to establish such a district to originate within the Board of Public Improvements, a purely administrative body.  The charter provides that a joint sewer district may be established "when the Municipal Assembly deems it necessary," and those words imply that the Municipal Assembly may amend a bill recommended by such board,

and that it determines, in the exercise of its legislative discretion, the necessity or propriety of the district, and in doing so it determines whether property within the district is benefited by the sewer.

5. ————: Classification: Denial of Equal Protection. An ordinance classifying subjects does not deny equal protection of the laws if the same means and methods be applied impartially to all subjects of each class, so that the ordinance will operate equally and uniformly upon all persons in like circumstances. The charter classifying sewers into public, district, joint district and private, and declaring that a public sewer shall be paid for wholly out of the general revenue, and district and joint district sewers shall be paid for by special taxes assessed against all property in the district, is not such an arbitrary classification as denies to the owners of property in a joint sewer district the equal protection of the laws guaranteed by the Fourteenth Amendment. The classification does not depend merely upon the method of paying the cost of the sewer's construction. The charter definition of a public, district or joint district sewer mentions other distinguishing elements and conditions, among them that a district sewer pertains to the future growth of the city, and a joint district sewer is made to depend upon necessities arising in districts already established, but in either kind of district the authorized ordinance applies alike to all property therein.

6. ————: Public or Joint District Sewer. The fact that the sewer constructed under a previous charter was a public sewer does not prevent the territory served by it from being organized into a joint sewer district under a new charter and the construction of a sewer therein as an auxiliary to aid the old existing inadequate sewer to carry off storm waters at times of heavy rain.

7. SEWER: For Untaxed Territory: Reduction of Taxbills. There was an existing sewer into which was turned, in dry weather, but not in flood times, the foul-water sewerage from sewers established in districts lying outside the boundaries of the joint sewer district established to aid the existing sewer to carry off the overcharge of storm waters in times of heavy rains. The joint district sewer does not serve any of the territory outside of the district that was not as adequately served by the existing sewer before said joint district sewer was built. Each of the outside districts was taxed to maintain its own sewers, and the dry-weather sewerage from their sewers was diverted into the old sewer existing in the joint sewer district as a sanitary arrangement, and added nothing to the requirements of the old existing sewer in dry weather, and if it adds an unappreciable amount in flood time it is not sufficient to

Haeussler  Investment  Company  v.  Bates.

affect the capacity of the new joint district sewer. *Held*, that the property in the joint sewer district is not burdened with the cost of draining territory outside of the district in such a way as authorizes a reduction in the amount of the tax bills issued in payment of the new joint district sewer.

8. ———: ———: Negligible Amount of Sewage: Temporary Arrangement: General Plan. A negligible amount of sewage coming into the joint district sewer from territory outside the district does not affect the validity of the district; and where such discharge is temporary, and the joint district sewer is constructed as a part of a general scheme of providing the city with an efficient sewer system, intelligently adapted to its topography, and manifesting a conscientious attempt to distribute the burdens of taxation equitably, it cannot be said that the boundaries of the joint sewer district were arbitrarily or oppressively or unreasonably fixed, or that the sewer is a public and not a joint district sewer.

9. TAXBILL: Issued Before Completion of Sewer. Where the sewer, constructed by units of quantity and units of price, was completed as a sewer at the time the taxbills were issued, but was not usable because of the necessary delay in making certain lateral connections, and because the unexpected high water in the river, which arose above the level of the sewer bed, made it impracticable and impossible to remove the bulkhead constructed near its mouth to prevent the backward movement of the river water, the taxbills for constructing the sewer were not invalid.

10. ———: ———: Damages. If injury to property in the district resulted from flood water about the time the taxbills were issued, and the flooded condition resulted from the work of constructing the sewer, the remedy for the damages is not a defense to a suit to enforce the tax bills as a lien.

11. ———: ———: Unusable Sewer: Reduction of Tax Bill: Cancellation. If the sewer was not usable at the time the tax bills were issued, because certain lateral connections had not then been made and could not be because a bulkhead near the mouth of the sewer to prevent the backward flow of the water could not then be removed, owing to unusual high waters in the river, which stood above its mouth, but at the time the suit to cancel the tax bills is brought the connections have been made and the bulkhead has been removed and the sewer is usable, the remedy of the taxpayer, notwithstanding the charter provides that he may plead in reduction of the amount of the tax bill that the work has not been done in a good and workmanlike manner, is to ask that interest on the tax bills be remitted for the time the sewer was not usable, and not

a cancellation of the bills, the sewer having been completed according to contract.

12. ———: Completed by City: Cancellation. The sewer having been constructed according to contract, by units of quantity and units of price, a taxpayer who brings suit to cancel the tax bills issued against his property cannot complain that lateral connections were made and a bulkhead near its mouth was removed at the cost of the city, after the high waters in the river had subsided, none of that cost being charged against his property.

Citations to Headnotes: 1 to 5, Constitutional Law: 1, 2 and 4, 12 C. J. par. 1061 (1926 Anno); 3, 12 C. J. par. 323; 5, 12 C. J. pars. 878, 892. Headnotes 6 to 12, Municipal Corporations: 6, 28 Cyc. 1130; 7 and 8, 28 Cyc. 1114 (1926 Anno); 9 and 11, 28 Cyc. 1169; 10, 28 Cyc. 1229; 12, 28 Cyc. 1171.

Appeal from St. Louis City Circuit Court.—*Hon. Franklin Ferriss,* Judge.

AFFIRMED.

*Charles R. Skinker, Leahy, Saunders & Walther* and *Lewis & Rice* for appellants.

(1) The charter makes no provision for notice or hearing in the establishment of taxing districts for sewers, and no notice was given or hearing had upon the question of benefits in the establishment of the taxing district for the Mill Creek Joint District Sewer. Therefore, the assessment is invalid, being violative of the due-process clause of the Federal Constitution. Londoner v. Denver, 210 U. S. 385; Turner v. Wade, 254 U. S. 64; Embre v. Road Dist., 240 U. S. 242, 257 Mo. 593; St. Louis Land Co. v. Kansas City, 241 U. S. 430; Land & Stock Co. v. Miller, 170 Mo. 240; Baumann v. Ross, 167 U. S. 549; McGhee v. Walsh, 249 Mo. 284; Houck v. Drainage Dist., 248 Mo. 373; Hamilton on Special Assessments, sec. 145; McQuillin on Mun. Corp., sec. 2074; Page & Jones on Taxation by Assessment, sec. 729; Farnham on Water & Water Rights, sec. 232, p. 1091. (a) A local assessment may be made by the Legislature itself without notice or hearing, but

when the power is delegated to a municipal body it cannot be exercised without notice to property owners and an opportunity to be heard at some stage of the proceedings. McGehee on Due Process of Law, p. 248. (b) The right to such notice and hearing must be accorded by the terms of the law pursuant to which the assessment is made. Security Trust Co. v. Lexington, 203 U. S. 323; Coe v. Armour, 237 U. S. 413. (c) The right must be accorded before the assessment becomes a fixed lien or charge. Soliah v. Heskin, 222 U. S. 522. (d) The only exception to the rule recognized by the courts is where the full legislative control over the subject has been delegated to the municipal legislative board and that body acts legislatively. Hancock v. Muskogee, 250 U. S. 454. (e) The charter does not confer such full legislative power upon the Municipal Assembly. The Assembly cannot initiate such a measure. It must originate with the Board of Public Improvements and the Assembly is given no power to amend a bill emanating from the board. It must either accept or reject the same as it comes from the board. Charter, art. 6, sec. 22; American Tob. Co. v. St. Louis, 247 Mo. 374; State ex rel. Belt v. St. Louis, 161 Mo. 371. (f) Full legislative power includes the free and unlimited exercise of discretion by the legislators. Forsyth v. Hammond, 71 Fed. 451; Railroad v. Commrs., 1 Oh. St. 88, approved in Field v. Clarke, 143 U. S. 694; Eubank v. Richmond, 226 U. S. 137; Cusack Co. v. Chicago, 242 U. S. 526; State ex inf. v. Colbert, 273 Mo. 211. (g) The Board of Public Improvements makes the inquiry into the facts and drafts a bill for establishment of the taxing district based upon its finding of facts and recommends to the Municipal Assembly the adoption of the assessment. The board is a purely administrative body. Kansas City v. Ward, 134 Mo. 172. The taxing district being in fact established by the board subject merely to the approval or rejection of the Municipal Assembly, the property

owner must be given an opportunity to be heard. (h) The Municipal Assembly in approving the assessment as made by the Board of Public Improvements was not acting legislatively. State ex rel. v. Gates, 190 Mo. 540; McKenna v. St. Louis, 6 Mo. App. 320; Weston v. Syracuse, 158 N. Y. 274; Switzinger v. Electric Co., 187 Pa. St. 539; Parks v. Boston, 8 Pick. (Mass.) 218; State v. Morristown, 34 N. J. L. 445; Forsythe v. Hammond, 71 Fed. 443; State ex rel. Subway Co. v. St. Louis, 145 Mo. 551; 2 McQuillin on Municipal Corp., sec. 704. (2) The ordinance classifying the sewer in question as a joint district sewer and the provisions of the charter permitting classification without regard to the size or character of the sewer and its purpose, but based entirely upon the method of payment, are arbitrary and void, and deny the equal protection of the laws guaranteed by the Fourteenth Amendment of the Constitution of the United States. Truax v. Corrigan, 257 U. S. 312; Sioux City Bridge Co. v. Dakota Co., 6 U. S. Rep. 43; Hays v. Poplar Bluff, 263 Mo. 533. (a) The rule is that classification for legislative purposes must depend on substantial differences which bear a proper relation to the attempted classification. Railroad v. Ellis, 165 U. S. 150; Magoun v. Bank, 170 U. S. 294; Yick Wo v. Hopkins, 118 U. S. 356; Cotting v. Stock Yards, 183 U. S. 107; Commission v. Railroad, 227 U. S. 88; Dobbins v. Los Angeles, 195 U. S. 223; St. Louis v. Handlan, 242 Mo. 88; Goodale v. Dowell, 62 S. C. 516; Railroad v. Ellis, 165 U. S. 150; Longview v. Crawfordsville, 164 Ind. 117; Railway v. Smith, 173 U. S. 684; Railway v. Green, 216 U. S. 409; Buchanan v. Warley, 245 U. S. 60; Baltimore v. Cahill, 126 Md. 596; Storck v. Baltimore, 101 Md. 476; State v. Loomis, 115 Mo. 307; Commonwealth v. Coal Co., 251 Pa. St. 134; Kellaher v. Portland, 57 Ore. 575; Stratton v. Morris, 89 Tenn. 497; Matthews v. Jensen, 21 Utah, 207; State v. Ide, 35 Wash. 576; Railway v.

Fuller, 205 Fed. 86;   Little v. Tanner, 208 Fed. 605;
Van Deman v. Rast, 214 Fed. 827;   Royster Guano Co.
v. Virginia, 253 U. S. 412;   Railway v. Road Dist., 256
U. S. 658.   (b)   Article VI, Section 20, of the Charter
of the city of St. Louis, committing to the Municipal
Assembly the discretion to classify sewers for the pur-
pose of taxation, being uncontrolled by any uniform rule
based upon a substantial reason bearing some legitimate
relation to the object of classification, is unconstitu-
tional legislation.   Hays v. Popular Bluff, 263 Mo. 533;
Railroad v. Commission, 196 Fed. 818;   Schneider
Granite Co. v. Gast, 240 U. S. 59;   State ex rel. v. Rail-
way, 262 Mo. 507;   St. Louis v. Const. Co., 244 Mo. 479.
This is especially true, because by the laws of Missouri
the sewer in question would be a public sewer, to be
paid for by the municipality, and not by private prop-
erty.   State ex rel. v. Wilder, 217 Mo. 261;   Southworth
v. Glasgow, 232 Mo. 108;   Schwabe v. Moore, 187 Mo.
App. 74.   (c)   Merely calling it a joint district sewer
instead of a public sewer does not make it what it has
been called, but the effort to shift the burden from the
general treasury to private property for an improve-
ment which, by all of the recognized definitions, is a
"public" sewer, constitutes a fraud and invalidates the
ordinance.   Albers v. St. Louis, 268 Mo. 349;   Kansas
City v. Hyde, 196 Mo. 498;   Ellis v. United States, 206
U. S. 259.   (d)   When the scheme of distribution of an
improvement tax is palpably arbitrary and constitutes
a plain abuse, it is violative of the Fourteenth Amend-
ment to the Federal Constitution.   St. Louis Land Co.
v. Kansas City, 241 U. S. 429;   Kansas Ry. v. Road
Impr. Dist., 6 U. S. Rep. 715.   (3)   The ordinance
establishing the taxing district in question is arbitrary
and results in favoritism to the owners of the properties
within the drainage area excluded and in oppression
upon those whose properties lie within the taxing dis-
trict.   The courts will declare such an unreasonable
ordinance void.   Dillon on Mun. Corps. (5 Ed.) sec. 592,

p. 920; McQuillin on Mun. Corps., sec. 2052, p. 4401; Page & Jones on Taxation, sec. 555.; 28 Cyc. 1122; Corrigan v. Gage, 68 Mo. 541; City v. Hyde, 196 Mo. 498; Masters v. City of Portland, 24 Ore. 161; Hanscom v. Omaha, 11 Neb. 37. These outlying properties being served by the joint district sewer, even though the storm water from the area may not find its way into the sewer, are benefited by the district sewer. Page & Jones on Taxation, sec. 563, p. 917. (4) The president of the Board of Public Improvements was without power to alter the contract entered into between the city and the contractor, and it is immaterial that the alteration did not result in any additional cost to the property owners specially assessed. Walsh v. Hunt, 120 Cal. 46; 1 R. C. L. p. 968; Bank v. Frickey, 70 Mo. 178. (5) Under the charter of the City of St. Louis the tax bills were not issuable until the contract had been fully performed. Article VI, sec. 22, Charter; Hund v. Rackliffe, 192 Mo. 330; Independence v Gates, 110 Mo. 374.

*Bates, Williams & Baron* for respondent.

(1) The tax bills make a prima-facie case. Their validity is presumed and the burden is upon those contesting the tax bills to prove their invalidity. All the testimony in these suits tended to support the validity of the special tax bills and there is none to the contrary. St. Louis Malleable Castings Co. v. Prendergast Constr. Co., 288 Mo. 197, affirmed 260 U. S. 469; Parker-Washington Company v. Field, 202 Mo. App. 159; Delmar Investment Co. v. Lewis, 271 Mo. 322; Collins v. Jaicks Co., 279 Mo. 404, 426; Charter, Art. 6, sec. 25. (2) The ordinances under which the work was done did not violate Section 20, or Sec. 30, Art. 2 of Mo. Constitution or the VII Amendment. Heman v. Schulte, 166 Mo. 409, affirmed Schumate v. Heman, 181 U. S. 402. The constitutionality of charter provisions providing for the construction of streets, alleys or sewers, and charging

the cost of such construction proportionately upon all property abutting the improvement or within the established benefit district, either according to the front-foot rule or according to the area rule is no longer open to debate. All such questions have been settled by the decisions of this court and those of the Supreme Court of the United States. Prior v. Const. Co., 170 Mo. 439; Hancock v. City of Muskogee, 250 U. S. 454; Ruecking Const. Co. v. Withnell, 269 Mo. 546; McGhee v. Walsh, 249 Mo. 266; Meier v. St. Louis, 180 Mo. 391; Withnell v. Ruecking Const. Co., 249 U. S. 63. (3) The appellants introduced no evidence whatsoever to prove that no notice or hearing was given either of the doing of work, assessment of the special taxes therefor, the establishment of the taxing district or the apportionment of the tax, consequently the question of lack of notice or hearing is not in the case, because the special tax bills make a prima-facie case and it was incumbent on the appellants to prove the facts upon which they base their defense. (a) No notice or hearing is required of legislative acts providing for public work, assessment of special taxes therefor, the establishment of the taxing district within which the special assessment shall be levied, or the apportionment of the tax according to a uniform rule applicable alike to all property in the district. Withnell v. Ruecking Const. Co., 249 U. S. 63; Mt. St. Mary's Cemetery Assn. v. Mullins, 248 U. S. 501; Hancock v. City of Muskogee, 250 U. S. 454; Valley Farms Co. v. County of Westchester, 261 U. S. 155; Miller & Lux v. Drain Dist., 256 U. S. 130; St. Louis Casting Co. v. Prendergast Const. Co., 288 Mo. 197, affirmed 260 U. S. 469; Heman v. Allen, 156 Mo. 551, affirmed in Shumate v. Heman, 181 U. S. 402; Meier v. St. Louis, 180 Mo. 409. (b) The same rule applies to provisions of ordinances of the legislative department of the city (at the time of the passage of the ordinances involved in this case, the Municipal Assembly). Mt. St. Mary's Cemetery Assn. v. Mullins, 248

U. S. 506; Hancock v. City of Muskogee, 250 U. S. 454; St. Louis Casting Co. v. Prendergast Const. Co., 288 Mo. 197, affirmed 260 U. S. 469; Heman v. Allen, 156 Mo. 551. (4) It is competent for the people of St. Louis to limit by their charter the legislative power of the Municipal Assembly. Such assembly has no inherent power to legislate without regard to the charter. It is entirely competent to require, as a condition precedent, a prior recommendation of the Board of Public Improvements. Such a provision confers no power on the board to legislate, but simply imposes a limitation on the Municipal Assembly. Findley-Kehl Inv. Co. v. O'Connor, 256 S. W. 800; Brown v. Phillips, 254 S. W. 700; Kansas City v. Mastin, 169 Mo. 80; Kansas City v. Bacon, 147 Mo. 259, 283; Pash v. St. Joseph, 257 Mo. 332; Jaicks v. Merrill, 201 Mo. 91. The acts of the Municipal Assembly in enacting ordinances providing for public work, assessment of special taxes therefor, the establishment of a taxing district within which the special assessment shall be levied, for the apportionment of the tax according to a uniform rule applicable alike to all property in the district, are legislative, notwithstanding its jurisdiction is dependent upon the recommendation of the Board of Public Improvements. Brown v. Phillips, 254 S. W. 700; St. Louis Casting Co. v. Prendergast Construction Co., 288 Mo. 197; City of St. Louis v. Gleason, 93 Mo. 33. (5) The charter provisions authorizing the Municipal Assembly to classify sewers within the city as "public," "district," "joint district" and "private," and establishing districts, are constitutional and valid. The action of the Assembly in exercising its authority by declaring a certain sewer to be a joint district sewer is conclusive. Heman v. Allen, 156 Mo. 534; Shumate v. Heman, 181 U. S. 402; McGhee v. Walsh, 249 Mo. 284; Prior v. Const. Co., 170 Mo. 448; Meier v. St. Louis, 180 Mo. 408; Heman v. Schulte, 166 Mo. 416. (6) The establishment of a joint sewer district and the assessment of

all of the ground within the sewer district having been intrusted by the State to the Municipal Assembly, the action of the latter will be held to be immune from attack unless it be affirmatively shown that such action was exercised arbitrarily, fraudulently and oppressively. Whether or not more or less ground should have been included in the district is a legislative and not a judicial question, and the action of the Legislature is not subject to review by the courts. St. Louis Casting Co. v. Prendergast Const. Co., 288 Mo. 197, aff. 260 U. S. 469; Heman Const. Co. v. Lyon, 277 Mo. 628; McMurry v. Kansas City, 283 Mo. 479; Prendergast Const. Co. v. Goldsmith, 273 Mo. 184, affirmed in Goldsmith v. Prendergast C. Co., 252 U. S. 12; McGhee v. Walsh, 249 Mo. 287; Heman v. Schulte, 166 Mo. 416; Johnson v. Duer, 115 Mo. 379; Jennings Heights L. & I. Co. v. St. Louis, 257 Mo. 291; Heman v. Allen, 156 Mo. 534, affirmed 181 U. S. 402; Mt. St. Mary's Cemetery Assn. v. Mullins, 248 U. S. 501; Hancock v. City of Muskogee, 250 U. S. 454; Valley Farms Co. v. County of Westchester, 261 U. S. 155.    (7)   The fact that some of the territory included in the Joint Sewer District does not directly drain into the new sewer, but continues to drain into the old sewer, does not matter, since both sewers are parts of a general system; the new sewer takes waters which formerly used to drain into the old sewer and relieves it to that extent. It makes no difference which waters are diverted into the new sewer, the purpose of the construction of the new sewer being to relieve the inadequate drainage of the district Prior v. Const. Co., 170 Mo. 439; McMurry v. Kansas City, 283 Mo. 479; McGhee v. Walsh, 249 Mo. 266; Collins v. Jaicks, 279 Mo. 404.   (8)   The fact that the Old Mill Creek Sewer was a public sewer is of no consequence. Prior v. Const. Co., 170 Mo. 439; McMurry v. Kansas City, 283 Mo. 479; Collins v. Jaicks, 279 Mo. 404; Land & Imp. Co. v. Kansas City, 173 Mo. 523.   (9)   If the tax bills are issued before the work is completed, but the

work is completed before suit is brought, the bills are valid and enforceable. Kiley v. Cranor, 51 Mo. 541; Weber v. Schergeus, 59 Mo. 389. (10) If there were any connections made with the sewer after the sewer was constructed and the tax bills issued, it in no manner affects the validity of the tax bills. Heman v. Allen, 156 Mo. 534, affirmed in Shumate v. Heman, 181 U. S. 402; Heman v. Schulte, 166 Mo. 417; Prior v. Const. Co., 170 Mo. 451. (11) In determining whether or not a sewer has been completed, it matters not whether some of the details of the work were not strictly in accord with the specifications of the contract, especially so when the city engineer ordered the changes, and the work was later accepted by the city authorities. Substantial compliance with the contract is sufficient. Porter v. Paving Co., 214 Mo. 1; Steffen v. Fox, 124 Mo. 630; St. Louis v. Ruecking, 232 Mo. 325; Johnson v. Duer, 115 Mo. 366; Stover v. Springfield, 167 Mo. App. 328; Meyers v. Wood, 173 Mo. App. 564. (12) Before a court of equity will enjoin the collection of the tax on account of its being excessive, or make a deduction from the amount of the tax bills, the plaintiff must tender the amount which he conceives to be actually due and just. Porter v. Paving Co., 214 Mo. 1; Johnson v. Duer, 115 Mo. 366. The charter under which this work was done makes such tender necessary. Charter, 1902, art. 6, sec. 25.

WHITE, J.—The plaintiff, the Haeussler Investment Company, seeks by this suit to cancel twenty-two special tax bills assessed against property of the appellant, issued and delivered to the Carter Construction Company by the city of St. Louis, in part payment for the construction of the Mill Creek Joint District Sewer. The respondent, Charles W. Bates, is the assignee and holder of these special tax bills. Other cases affecting similar tax bills, pending in this court, were tried with this case; each of them is to abide the decision in this

case. Still other cases were tried separately and are pending here on appeal.

The plaintiff seeks to cancel the tax bills for several reasons which may be briefly stated as follows:

First: The owners of the property in the Mill Creek Joint Sewer District, in violation of the Fourteenth Amendment to the Federal Constitution, were denied due process of law, in that the district was established and the entire proceeding carried through without notice to, or opportunity to be heard by, the owners of the property against which the special tax was assessed, the charter of St. Louis having no provision for notice.

Second: The establishment of the district denied the plaintiff the equal protection of the laws required by the Fourteenth Amendment to the Federal Constitution, in that the Charter provisions of the city permitted an unreasonable classification of sewer districts.

Third: Dividing the work into two sections, to be performed under separate contracts, was violative of the Fourteenth Amendment in that it was a denial of equal protection of the laws.

Fourth:. Section 20, Article V, of the Charter, authorizing the classification of districts, was violative of the Fourteenth Amendment, in denying equal protection of the laws, because it authorized a tax without respect to the benefits conferred.

Fifth: The sewer constructed is in fact a public sewer, and should be paid for out of the public treasury; calling it a private sewer does not make it so.

Sixth: The sewer as established drains territory outside the sewer district which receives the benefit without being taxed, and the territory without the district is taxed to pay for it, thus denying equal protection of the laws to persons owning property within the district.

Seventh: The special tax bills were issued before the work was completed, and the work was not completed by the contractor.

Eighth: There were unauthorized alterations in the contract.

The defendant filed answer and a cross-bill, in several counts, asking judgment enforcing each of the tax bills which the plaintiff sought to cancel. To the cross-bill plaintiff filed its answer setting up the same alleged infirmities in the tax bills as alleged in the petition.

Some time in June, 1914, the authorities of the city of St. Louis adopted plans for the formation of the Mill Creek Joint Sewer District and the making of contracts for the construction of the Joint District Sewer in two sections.

Ordinance No. 27687 provided for the construction of the Mill Creek Joint District Sewer.

Ordinance No. 27688 provided for the construction of the first section of the sewer and the payment of the city's portion of the cost.

Ordinance No. 27689 provided for the construction of the second section of the sewer, etc.

After the passage of these ordinances bids were received and contracts for both sections let to the Carter Construction Company. The contract was to be performed "under unit quantities and unit prices." That is, the work and material were classified and were to be paid for by the quantity.

The first section, under the Carter contract, and the unit prices, was estimated to cost $1,399,924.20, and the second section $1,672,530.

Before receiving bids the cost was estimated by the city at $1,650,000 for the second section, and $1,850,000 for the first section. Other bids were higher, while the figures of the successful bidder, the Carter Construction Company, were considerably lower than the estimate.

The Mill Creek Joint Sewer District comprises 5122 acres, including streets and highways, an area of eight square miles. It extends from the Mississippi River westward, and comprises territory surrounded by a natural watershed, modified to some extent by street improvements. The sewer was called a relief sewer. It was constructed near and parallel with the old Mill Creek Sewer. It was a tunnel structure in horseshoe

shape sixteen and a half feet in diameter. The old Mill Creek Sewer was a gravity sewer with a fall so that the sewage flowed naturally to its outlet in the Mississippi River. The Joint District Sewer, or relief sewer, was a pressure sewer, built on a level throughout, so that water was carried out by pressure from intake shafts where the sewage flowed into it from above. It was designed to take care of flood water, the old Mill Creek Sewer being entirely sufficient to carry off the ordinary sewage, but insufficient to take off the flood water in times of rain and storm.

The trial court found against the plaintiff, rendered judgment for defendant on each of the tax bills, and plaintiff appealed.

I. The appellant contends that the special assessment, tax bills for which it seeks to cancel, is violative of the due process clause of the Fourteenth Amendment to the Federal Constitution.

The charter of the city of St. Louis, under which the sewer district under consideration was laid off, establishes a sewer system in which sewers are divided into four classes, each class defined as provided for.

The Charter, Section 20, Article VI, is as follows:

"*Classification of Sewer System—'public,' 'district,' 'joint district' and 'private.'*

"A sewer system is hereby established which shall be divided into four classes, viz: 'Public,' 'Joint District,' 'District,' and 'Private' sewers; the *classes in any case being determined by the authority of its construction, and the definitions hereinafter specified, irrespective of the area drained, the size, character or purpose* of the sewer. . . .

"Public sewers are defined to be those heretofore constituted or acquired under authority of an ordinance and paid for wholly out of the general revenue. Public sewers hereafter constructed shall be such sewers as the *Board of Public Improvements* may deem it expedient to establish and construct without creating a sewer

district or joint sewer district; and such sewers may be established and constructed at such times, to such extent, of such dimensions and materials, and under such regulations as may be required by ordinance, recommended by the *Board of Public Improvements,* and shall also consist of such branches to sewers already constructed as may be considered expedient by *said board.* . . .

"District sewers are defined to be those constructed or acquired under authority of ordinances within the limits of an established sewer district and paid for by special tax assessed upon the property in the district.

"Joint sewer districts are defined to be those constructed or acquired under the authority of ordinances uniting one or more districts or unorganized territory, for the purpose of providing main outlet or intercepting sewers, for the joint benefit of such district or territory, and paid for by special taxes assessed upon all the property in said joint sewer district.

"Private sewers are defined to be those built with or without permits and paid for by the parties, persons, associations or corporations constructing them."

Section 22, Article VI, of the Charter, provides for the establishment of a joint sewer, as follows:

"Joint district sewers may be contracted or acquired as follows:

"Whenever the Municipal Assembly on recommendation of the Board of Public Improvements deems it necessary that a sewer be constructed in any part of the city for drainage or sanitary improvements of a section of the city comprising more than one established sewer district, or territory not yet in an established sewer district, it may, by ordinance unite and establish such sewer districts, or parts thereof, and unorganized territory, into a joint sewer district, and cause a sewer or sewers to be constructed therein, and the whole cost thereof to be assessed against all the property within the boundaries of such joint sewer district as a special tax."

It seems to be conceded that the method of apportionment of cost according to area is not open to

objection; several times it has been approved by this court. [Prior v. Construction Co., 170 Mo. l. c. 448; Johnson v. Duer, 115 Mo. l. c. 376-377; Withnell v. Ruecking Construction Co., 249 U. S. 63, l. c. 69.] The charter having the force and effect of a legislative act, definitely fixes the method by which the apportionment shall be made, leaving to the city authorities only the mathematical ascertainment of the tax assessed against each of the pieces of property.

*Notice.*

The distinction which the appellant seeks to make between the *laying off* of the district and estimating the assessment against *each tract* is expressed in the opinion last cited, in saying that when the assessment is made in accordance with a fixed rule adopted by a legislative act the property owner is not entitled to be heard in defense on the question of the amount and extent of the assessment. Whereas, in fixing the boundaries of the district requiring the exercise of discretion, the argument runs, the property owner has a right to be heard as to whether the property will be benefitted.

In districts laid off for taxation purposes to pay for certain improvements, such, for instance, as drainage districts and road districts, an owner of property in the proposed district no doubt generally has a right to be heard, at some stage of the proceeding, upon the question whether his property would be benefitted by the establishment of the district. Whether or not notice to property owners is required, before laying off a district for special-taxation purposes, depends upon whether the official body which established the district acts in a legislative capacity, or in a judicial or administrative capacity. The Legislature, or other body exercising legislative functions, may ascertain and determine, as a legislative act, the question of benefits accruing to property owners, and the propriety of the establishment of a taxing district for a public improvement. That determination of the Legislature is conclusive; no notice or hearing is necessary in order that the property may be burdened with the cost of the improvement.

Further, it may be said that generally the Legislature cannot delegate its purely legislative functions. It may confer upon certain officers, boards, commissions or courts to carry out the legislative will by ascertaining facts upon which the operation of the legislative act would depend, or for the purpose of putting into force legislative acts in certain limited districts. These are not strictly legislative powers, delegated by the Legislature, but administrative, requiring the exercise of no discretion. These apply to the assessment of the property within the established district.

It is argued by the appellant that the authority exercised by the Municipal Assembly of the city of St. Louis to *establish* a sewer district, requiring the exercise of discretion, is a power *delegated* to the municipal body. The appellant assumes that the charter powers granted the city of St. Louis and the charter itself is delegated by the law-making power of the State. The case is argued as if the charter emanated from the State Legislature. Since the Legislature cannot delegate authority to make laws, the power delegated to the city of St. Louis cannot be legislative power, but merely administrative.

The error of this position is in the assumption that the authority of the Municipal Assembly of St. Louis, provided in the charter, is derived from the Legislature, whereas it comes from the Constitution itself. The charter power of the Municipal Assembly of St. Louis is governed by Sections 16, 17, and 20-23, Article IV, of the State Constitution. Any city of more than one hundred thousand inhabitants may "frame a charter for its own government, consistent with the Constitution, and laws of the State." Thus the authority given the people of St. Louis to frame a charter comes direct from the Constitution and is not dependent upon any legislative act. The Legislature is powerless to repeal that charter by any direct act. A provision of it would lose its force only if it were inconsistent with some general law enacted by the Legislature. In the case of State ex inf. v. Col-

bert, 273 Mo. 211, cited by the appellant, Division Two of this court had occasion to point out the constitutional authority possessed by some municipal bodies to fix taxing districts.

The Supreme Court of the United States in Withnell v. Reucking Construction Company, supra, in discussing the legislative authority of the city of St. Louis (249 U. S. 63, 1. c. 69-70), quoted from an earlier case:

"As the legislative power of a State is vested in the Legislature, generally that body has the supreme control, and it delegates to municipal corporations such measure thereof as it deems best. The city of St. Louis occupies a unique position. It does not, like most cities, derive its powers by grant from the Legislature, but it framed its own charter under express authority from the people of the State, given in the Constitution. . . .

"And this charter is an organic act, so defined in the Constitution, and it is to be construed as organic acts are construed. The city is in a very just sense an '*imperium in imperio*.' Its powers are self-appointed, and the reserved control existing in the General Assembly does not take away this peculiar feature of the charter."

The United States Supreme Court in the case of Hancock v. City of Muskogee, 250 U. S. 454, 1. c. 458, cited the Withnell case, and after discussing the powers of cities in Oklahoma as similar to the powers of cities in this State, said: "Where that has been done, a legislative determination by the local legislative body is of the same effect as though made by the general Legislature."

The legislative power of cities is by the authorities put also upon another ground, which would apply to all cities. The authority of cities to pass ordinances for its government is legislative in character, and is derived from the common law, established by long practice in local self-government; it is not a delegation from the law-making body of the State. [Metcalf v. St. Louis, 11 Mo. 1. c. 105; Cooley on Const. Lim. (7 Ed.) 1. c. 264-265; Dillon on Mun. Corp. (5 Ed.) 1. c. sec. 573; McQuillen

on Mun. Corp. sec. 124; Stoutenburgh v. Hennick, 129 U. S. l. c. 147; 19 R. C. L. p. 706. See also concurring opinion of JAMES T. BLAIR, C. J., in case of State ex rel. Lashly v. Becker, 290 Mo. 1. c. 634-635.]

Here, however, we need only to refer to the constitutional power of the city of St. Louis.

It has been held directly that the laying off of a taxing district in the city of St. Louis and in other cities of the State, to pay for public improvements, is purely a legislative function, and no notice is necessary. [Malleable Casting Co. v. Prendergast Const. Co., 288 Mo. 1. c. 220-221.] In Brown v. Phillips, 254 S. W. 1. c. 702, it was held by Division One of this court:

"Whether it is necessary or expedient to make the proposed street improvement, and whether the expense of making it should be assessed upon abutting properties, *are purely legislative questions.* The power to determine them is vested in the Common Council of Kansas City." (Italics ours).

The principle is applicable here. The determination of the propriety and expediency of laying off a joint sewer district is purely a legislative function.

II. It is further claimed by appellants that the charter of St. Louis, as quoted above, does not confer full legislative power upon the Municipal Assembly in laying off the sewer district, because the movement must originate within the Board of Public Improvements, a purely administrative body with no legislative functions. It was upon the recommendation of the Board of Public Improvements *only* that the sewer district could be established. The argument is that the Board of Public Improvements must not only originate the scheme for establishing the district, but the Municipal Assembly has no authority to amend a bill which the Board of Public Improvements presents for passage. This court has held just the contrary in the case of Brown v. Phillips, supra; also in Findley-Kehl Inv. Co. v. O'Connor,

256 S. W. 1. c. 800. The Board of Public Works of Kansas City had authority such as is possessed by the Board of Public Improvements of St. Louis to recommend improvements. It was held in those cases that such a board was not a legislative body, but purely an administrative department of the city, and its authority was but a limitation upon the legislative power of the Municipal Assembly. Such limitation, restricting the Municipal Assembly, so that it must act only upon certain conditions, does not detract from its legislative authority within the limits. It was held in the Brown case that the council was in no way bound by the board's recommendation. The language of the St. Louis charter, Section 22, Article VI, provides that a joint district sewer may be constructed "when the Municipal Assembly *deems it necessary.*" It is the Municipal Assembly in the exercise of its legislative discretion that determines the question as to the necessity or propriety of the sewer district, and in doing so determines whether the property within the district is benefited by its establishment. The Municipal Assembly being a legislative body, depends upon administrative departments of the city for information as to the matters upon which it acts. In public improvements, whether provided.for by legislative authority or otherwise, generally expert advice and information are necessary before the authorities can act intelligently.

Section 22, Article VI, of the Charter of St. Louis, grants the power to the Municipal Assembly in general terms, without limitation or restriction. While as a prerequisite there must be a recommendation by the Board of Public Improvements, the Municipal Assembly may frame its own ordinances with such conditions and restrictions as it sees fit. By the express terms of the section it may establish a sewer joint district in a territory, or part thereof, as it sees fit.

III. A further reason for invalidating the tax bills is urged by appellants in that the ordinance classifying

the sewer under consideration as a joint sewer is vio-
lative of the Fourteenth Amendment re-
Classification: quiring equal protection under the laws.
Equal Protection. If we understand the point made by ap-
pellants, while it is stated that the ordinance has that
effect, it is because the provisions of the charter in classi-
fying sewers into "public," "district," "joint district"
and "private" sewers denies equal protection of the laws.

The argument is that the classification is purely ar-
bitrary, based entirely upon the method of payment in
each district, which is no classification at all, but leaves
it to the discretion or whim of the Board of Public Im-
provements as to what class a sewer may be assigned.

A statute classifying subjects does not deny equal
protection of the law, if the same means and methods be
applied impartially to all the subjects of each class so
that the law will operate equally and uniformly upon
all persons in like circumstance. [State v. Brodnax,
228 Mo. l. c. 44; Hawkins v. Smith, 242 Mo. 696; People
v. Mensching, 10 Am. Ann. Cases, l. c. 103; 12 C. J. 1147.]
If the classification is based on a reason, even though
the reason be a poor one, where it treats all similarly
situated alike, the principle is not violated. [12 C. J.
1152.]

The above provisions of the charter were adopted
in 1901. The city of St. Louis, of course, for many years
before that had had a sewer system. The assertion of
the appellants that the classification depends merely up-
on the method of payment for the sewer is not correct.
The very terms, "public sewer," "district sewer," etc.,
have a significance which show a classification. No one
needs other information to know what is meant by pri-
vate sewer; it concerns no person except the individual
affected by it. The meaning of "public sewer" and
"district sewer" must have been well understood in the
city of St. Louis from long experience in connection with
them. There can be no question that the joint district
sewer, with which we are concerned, was classified so
as to exclude any possibility of confusion with any

other kind of sewer, as it is classified in Section 22, Article VI, of the Charter, quoted above. The provisions of that section clearly set out the objects to which it may be applied. A joint district sewer can be established only where there is more than one established sewer district, or territory not yet in an established sewer district. It is sufficiently inclusive and exclusive to furnish definite information as to what property or persons may be included in it.

Undoubtedly the charter vests in the Municipal Assembly, with the advice of the Board of Public Improvements, certain discretion as to the limits and boundaries of a sewer district. The appellant has not stated any method of classification which might meet its objection. It argues that any reason for the classification must inhere in the subject-matter, arising naturally from the conditions; but it does not mention any of the features which it is practicable to include in the designation of a particular class of sewer districts. There could be no definite limit of the boundaries of the districts because the boundaries would depend upon the natural contour of the land as well as the population and the uses to which the land was put. Since the city was already supplied with sewer districts, the classifications in establishing districts necessarily would apply to future operations. That is, a sewer district for a district sewer would depend upon the growth of the city A joint district sewer would depend upon the necessities arising in districts already established. Beforehand it could not be stated with definiteness just how those districts would be determined as to the territory embraced. All this must be left to the discretion of the Municipal Assembly in providing for the needs of the city as they arise.

The cases which appellant cites, such as Hays v. Poplar Bluff, 263 Mo. 516, are not in point. That case is one where it was left to the discretion of the mayor and city council to exclude certain property from the requirements of an ordinance fixing fire limits. There, and in cases of that kind, the authorities, by the express

provision of the classifying law, were given discretion to discriminate between individuals affected. Of course such laws are unconstitutional. The only way in which appellant could apply that principle here would be to say that the Municipal Assembly and Board of Public Improvements had discretion to include or exclude any particular territory from a district. To deny them that authority would be to deprive them of the right to establish districts with any definite boundaries. If they have authority to establish the district they have authority to fix its boundaries.

IV. The appellant, however, asserts that the sewer in fact is a public sewer, and the mere calling it a joint district sewer does not make it so. Appellant does not call our attention to any facts in the record which support that contention except that the old Mill Creek Sewer was a public sewer. It was constructed under the previous charter of the city which was amended in 1901.

Public or Joint District Sewer.

In Prior v. Construction Company, 170 Mo. l. c. 449, it was contended that a joint district sewer was in fact a public sewer. The court in referring to the amendment to the charter used this language: "The people had power to abolish public sewers entirely, and to provide for district sewers entirely, or for district, joint district and private sewers. The people had the power to require that all sewers should be paid for out of the public revenue, and the people had just as much power to provide that all sewers, by whatever name they might be called, should be paid for by special assessments against the property benefited thereby, and to apportion that benefit according to the front-foot rule, or the area rule, or the benefit-district-area rule."

The ruling in that case is approved by this court in the later case of McMurry v. Kansas City, 283 Mo. l. c. 496. So the fact that the old Mill Creek Sewer was a public sewer under the old charter does not prevent the territory served by it from being now organized as a joint

sewer district under the new charter. Section 22, Article VI, of the charter, in the passage quoted, authorizes the establishment of a joint district sewer where two or more sewers are constructed. True, a public sewer is created without establishing a sewer district. It might be in or out of a sewer district. If the old Mill Creek Sewer was not in any sewer district it is covered by that part of Section 22, which authorizes the inclusion of unorganized territory into a joint sewer district.

V. The point is made that the Mill Creek Joint Sewer serves outside territory, and that the property included in the sewer district is burdened with the cost of draining this outside territory. The Mill Creek Joint Sewer District comprises 5122 acres, about eight square miles, inclusive, and 3,834.40 acres, exclusive, of streets and highways. It is an irregular shape, extending from the Mississippi River westward, the east and west extent being greater than the widest portion north and south, with a narrow end bordering on the river. It is described as a natural drainage basin, bounded on the west by what is known as the Taylor Avenue Ridge. The water shed boundaries of the district are modified somewhat by city improvements, such as gradings, buildings, etc.

To the west of Taylor Avenue lies territory amounting altogether to about 16,000 acres which the appellant claims is served by the sewer. There are several tracts included in this territory, as follows:

Portion of St. Louis County, outside
    city limits ......................11,105 arces
Washington Heights ................  316 acres
Euclid District ......................  650 acres
Blackstone and Clarendon .......... 1,581 acres
Hodiamont .........................  339 acres
Tower Grove ....................... 1,645 acres

Each of these, with the exception of the St. Louis County tract, indicates a separate and distinct sewer district. All these tracts are west of the watershed,

306 Mo.—27

along the western boundary of the Mill Creek Joint Sewer District, and drain naturally into the River des Peres, which meanders through the city and empties into the Mississippi River.

The territory in St. Louis County has no direct connection with the Mill Creek Joint Sewer District. A sewer called the Pine Street foul-water sewer discharges into a branch of the Mill Creek Sewer at Sarah and Pine streets. At a certain point in Forest Park the city installed pumps by which the dry weather sewage could be pumped from the River des Peres into the Pine Street Sewer. This sewage eventually would flow into the old Mill Creek Sewer. The capacity of these pumps is described as ten cubic feet per second. The purpose of installing these pumps was, in dry weather, to pump the foul water out of the River des Peres for sanitary reasons and get it into the sewer. They were used on an average of about two hundred days in the year, not continuously during each day; the use varied according to the requirements in the River des Peres. In times of rain the pumps were not used, and flood water from this district flowed naturally into the River des Peres. The appellant quotes from Section 22, Article VI, of the Charter of St. Louis, as follows:

"But if a joint district sewer is to drain territory part of which lies outside the city limits, and cannot be included in the joint sewer district, then the Municipal Assembly shall provide in an ordinance or ordinances authorizing the construction of the joint district sewer or sewers, that a part of the cost of such sewer or sewers, in the proportion that the area of the unincluded territory bears to the whole area drained, shall be paid out of the general revenue, in which case the remainder of the cost shall be assessed as hereinafter provided."

The territory served in the manner mentioned being about double the territory in the Mill Creek Joint Sewer District, the result of appellant's argument would be that the city should pay a like proportion of the cost of the joint sewer out of the general revenue.

This Pine Street Sewer and the pumps whereby the foul water of the River des Peres was emptied into the Pine Street Sewer were in operation before the Mill Creek Joint Sewer District was laid out and before the new sewer was constructed. The old Mill Creek Sewer, as we understood the evidence, takes care of this flow, just as it did before the construction of the new sewer. The dimensions and capacity of the new sewer were not affected in the least by this arrangement. Its capacity was determined by the flood water volume in the district which it was designed to serve and it gets no flood water from the St. Louis County territory. There is no justification for appellant's complaint regarding the territory in St. Louis County.

The Washington Heights Sewer District is drained by a number of laterals which discharge their sewage into the River des Peres. It has no connection with the Mill Creek Sewer District except by means of the pumps mentioned. With respect to its drainage it is in the same situation as the territory in St. Louis County.

The Euclid Avenue Sewer District lies directly west of Taylor Avenue, and it is drained by a sewer discharging into the River des Peres. This sewer is eight or ten feet in diameter. The Pine Street Sewer mentioned is thirty or forty feet below the surface of Taylor Avenue, and the Euclid Avenue Sewer crosses over it at Pine and Euclid. It is connected with the Pine Street Sewer by a small pipe controlled by a valve, extending downward to the Pine Street Sewer. It was intended to divert the ordinary dry weather flow from the River des Peres, and drop it down into the Pine Street Sewer.

The Blackstone and Clarendon sewers, draining two subdivisions, come together and unite as one sewer and discharge into the River des Peres. The outlet is fourteen feet in diameter. This sewer is connected with the Pine Street Sewer by a small pipe in much the same manner as the Euclid Avenue Sewer.

The Hodiamont district has a sewer which drains the district into the River des Peres; it also has a small

pipe opening into the Pine Street Sewer at the bottom. The total capacity of all these pipes by which the water can be drained into the Pine Street Sewer is estimated at ninety-five cubic feet per second.

The Tower Grove Joint Sewer District contains 1645 acres; its main sewer is ten or eleven feet in diameter. At one point two eighteen-inch pipes are let into the side of that sewer, so as to connect with a lateral of the old Mill Creek Sewer. The capacity of these pipes is described as being ninety cubic feet per second.

These several territories have their district sewers that carry sewage naturally into the River des Peres and thence into the Mississippi River. The pipes by which they connect with the sewers flowing into the old Mill Creek Sewer have a capacity of less than two hundred cubic feet per second, which is insignificant compared to the capacity of those district sewers as their dimensions are shown above. The capacity of the old Mill Creek Sewer and the Joint Mill Creek Sewer is 6600 cubic feet per second. Thus the total capacity for sewage received from outside the district is less than three per cent of the joint sewer's capacity.

The purpose of these connecting pipes was to keep the foul water out of the River des Peres when in dry weather there was a small stream trickling along those sewers. This system was in operation when the new Joint Sewer District Sewer was established. The new joint district sewer was constructed because the old Mill Creek Sewer could not take care of the flood water, and its capacity was figured for that purpose. Except in times of flood the old Mill Creek Sewer took care of the drainage from those outside districts. The capacity of the new joint sewer, designed to take care of the flood water, could not have been figured with reference to that flow. The small amount which came in through those connecting pipes, of course, assisted in the time of flood to tax the capacity of the old Mill Creek Sewer and added that much to the volume in

that sewer, but it is infinitesimal compared to the amount required to take care of the excess in time of flood.

Those connecting pipes could carry in no flood water except what became mixed with the foul water passing through those pipes. It is not stated whether those pipes were running full capacity in dry times or not. It is suggested in some of the evidence that they might become clogged, which of course would not add to the volume in storm time. So far, then, as the territory outside the joint district is served, it was already served before the construction of the new joint district sewer, by the arrangement to protect the territory along the River des Peres from the unsanitary conditions which would have ensued if this sewage was allowed to flow into the river.

It is claimed by the appellant that all this outside territory should have shared equally in the expense of the new joint sewer district on the theory that it was served *equally* with the territory in the joint sewer district. The flood water of all those districts in general was carried into the River des Peres. That territory was served after the establishment of the new district sewer exactly as it was served before. It received no more water from outside the district than it received before. If the people in the district had any right to complain of having to pay for draining territory outside the district they had that right when the connections were first made.

Mr. Horner, Civil Engineer, explained the situation this way:

"All the flood water west of Taylor Avenue goes into the River des Peres. With this qualification, with these small openings that I have referred to in these western sewers which are intended to extract the sewage and take it down to the Pine Street Sewer, in two instances remained open during the rain and a small amount of water recedes to them in the Pine Street Sewer. It is very small. . . .

"*The territory west of Taylor Avenue had no bearing on the necessity of construction of the joint district sewer, because flood out there is caused by the inadequate nature of the other sewers which discharge into the River des Peres.*"

He further described the Pine Street Sewer as a very small sewer.

The evidence does not show that the flow in the Pine Street Sewer was increased in flood time from the amount that flowed in dry time. The evidence shows it might be less because the pumps, by which the foul water from River des Peres was turned into the Pine Street Sewer, were not operating in flood time. There is nothing to indicate that the Mill Creek Joint District Sewer served any of the territory outside the district that was not as adequately served before. Each of those outside districts was taxed to maintain its own sewers, and the dry-weather sewage was diverted into the old Mill Creek Sewer purely as a sanitary arrangement. It added nothing to the requirements of the old Mill Creek Sewer in dry weather when that necessity existed, and if it added an unappreciable amount in flood water it was not sufficient to affect the estimated capacity and the required capacity of the Joint Mill Creek Sewer. The city properly considered the subject as one affecting the entire city. The diverting of the foul water in the manner indicated was a sanitary measure which was as valuable to the people in the Mill Creek District as to the people outside of it. Since it had no appreciable effect upon the cost or capacity of the Joint Mill Creek Sewer it cannot be said that the territory outside was served so as to compel it to pay a part of the cost proportioned to its area.

Evidence was further introduced over the objection of appellant to show that the arrangement whereby the Tower Grove District emptied a part of its sewage into the Mill Creek Sewer was only temporary until the River des Peres Sewers should be built. This indicated that the city authorities designed to include the entire city in a general scheme and plan of sewage so as to

protect the health of all the people.   Mr. Horner testified:

"The entire foul-water flow west of Taylor Avenue was disposed of through the Pine Street Sewer into the old Mill Creek Sewer and the entire foul-water flow in dry weather within the taxing district was also disposed of in the same way."

The facts just considered show that laying off the sewer district was not arbitrary, oppressive nor unreasonable.   In Prendergast Const. Co. v. Goldsmith, 273 Mo. 184, 1. c. 196, this court held that a negligible amount of water coming in from territory exterior to a sewer district did not affect the validity of the district.   Instead of showing arbitrary and oppressive action on the part of the Municipal Assembly this distribution of the burdens showed a conscientious attempt on the part of the city authorities to distribute equitably the burdens of taxation for sewer purposes.   Everything done of which the plaintiff complains was in the interest of the city as a whole, including the people in the joint sewer district.   Appellant has not pointed out how any of the territory omitted from the district could have been included on any equitable basis.

The evidence showed that the connections of the Blackstone, Clarendon and Hodiamont with the Pine Street Sewer was made when these western districts were sewered.   The city had it done, and the contractor in this case had nothing to do with it.   Those connections with the Mill Creek Sewer system are casual and slight; they may be discontinued if it should be found necessary.

VI.   Appellant urges further that the taxbills should be canceled because they were issued before the sewer was completed in accordance with the contract and specifications.   The charter, Section 22, Article VI, provides that "whenever the whole or a section

**Taxbills Issued before Construction Completed.**   of the joint district sewer is fully completed," the Sewer Commissioner shall compute the cost, certify the same to the Board of Public Improvements and the president of

the Board shall assess it (the cost) as a special tax against the property. The tax bills for the second section were dated May 6, 1916, and delivered to the contractor May 31st. The bills for the first section were dated June 23, and delivered July 6, 1916. Certain connections of the sewer with the laterals were not made by the contractor at all, but completed by the city about August 10, 1916. The sewer was not in operation until after those connections were made. The explanation of that situation appears in a letter by the president of the Board of Public Service to the contractor, dated March 31, 1916, in which he informs the Carter Construction Company that some work originally planned was impracticable at the time, and mentioned four intake shafts, which could be connected with the new sewer by removing bulkheads, breaking out walls, etc. The letter then stated that it was impracticable to complete the work at that time for the reason that a flood might occur that would jeopardize human life and ruin any construction in process at the time. The letter concludes: "You may consider this, therefore, your authority to leave the work as above described, the city assuming all the unfinished construction."

Mr. Kinsey, the president of the Board of Public Improvements, explained the matter in his evidence. The Mill Creek Joint Sewer was not a gravity sewer; it was built on a level grade throughout its entire length, and it was below the high-water level of the Mississippi River. When the river should rise above the level of the bottom of the sewer the river water would back up in the sewer through its entire length. The water poured into it from intake shafts and laterals above, the pressure thus moving it into the river. In order to protect the workmen while engaged in the excavation, bulkheads were built near the mouth of the sewer so as to exclude the river water. During the year 1916, the river remained unusually high so that the bulkheads mentioned could not be taken out. The matter is best explained in Mr. Kinsey's language:

"The sewer construction was fully completed at the time the work was accepted by the city of St. Louis. All that time the river was entirely above the top of the sewer, and there were some connections to be made in this relief sewer with the shafts of that sewer. It was necessary to exclude the river from the sewer until such time as the connections could be made. The only thing the Duncan Avenue connection had to do with the bulkhead was that it was wholly unwise and impracticable to make any connections into the sewer so long as the bulkheads remained. It would not have been good sense to have turned into that sewer flood waters, or make connections so that flood waters might be turned into it while the bulkheads remained in place, and yet the bulkheads could not be removed on account of the high stage of the river; to attempt to remove them would have resulted in the drowning of the men working with it. To remove the bulkheads was a simple process, after the bulkheads became accessible—after the river had fallen to such a stage that it would be possible to work on them. It simply meant tearing down a brick wall. . . .

"The Carter Construction Company never did the work of making these connections. There was certain work in connection with them which we might have required them to do under the contract, but which we did not require them to do and for which we did not pay them. . . .

"The contract required the contractor to perform certain work specified under unit quantities and unit prices. The engineer in charge having the power to modify the extent or quantity of the work, as, in his judgment, it might be found necessary, and in the exercise of that judgment we directed them not to do certain work on these connections. . . .

"The bulkheads were still in the sewer, and it was not practical to connect the sewer until the bulkheads had been removed. That was not a matter that could

have been provided for in the plans and in the contract, in advance; that was a matter controlled entirely by the stages of the water in the Mississippi River, something that we had no control over."

No objection is made to Mr. Kinsey's interpretation of the contract in that it authorized the engineer to modify the extent or quantity of the work as in his judgment it might be found necessary. He had authority to eliminate some of the work from the contract; the city would not pay for such omitted work, it all being under the unit quantities and unit prices.

The point which the appellant makes is that the sewer was not a completed and usable improvement at the time the tax bills were issued, and therefore the cost was charged against the owner's property before it had any benefit whatever. As we understand the argument, the appellant contends that this was not only premature, but should cancel the tax bills as being absolutely void, because they were not issued and dated three months later. Certain results may be observed as to that matter.

The property owner was not required to pay for the work which the contractor did not do.

If the connections had been made with the laterals and intake shafts it would have added nothing to the usableness of the sewer, because of the bulkheads at the outlet of the sewer which must be removed before the other connections would have had any effect. The sewage might have flowed into the joint sewer, but could not have flowed out.

The removal of the bulkhead at the mouth of the sewer was not only impracticable, but impossible, because the water from the Mississippi River stood above it. This is described as a condition which could not be foreseen because of the unusual flood conditions during that summer.

As Mr. Kinsey says: "The sewer construction was fully completed, at the time the work was accepted by the city." The sewer for which the tax bills were issu-

ed was finished.  The weather conditions prevented its being used or being put in usable condition.  At the time the suit was brought in May, 1917, the bulkheads had been removed, connections made, and the sewer was in full operation.  All the parties affected had the full benefit of it as a completed job.  The only injury which they suffered was the delay in obtaining the use of it.

Something is said about a flood which occurred during the summer of 1916, which caused considerable damage to property in the neighborhood.  We have not been pointed to any evidence which shows that the work of constructing the joint sewer had anything to do with that occurrence.  At any rate, the remedy for the damage which ensued on that account would be other than a defense on the tax bills.

The appellant, on account of this delay, seeks to have all the tax bills canceled.  Section 25 of Article VI of the Charter provides that a party charged with payment of a tax bill may plead in reduction of the amount that the work was not done in a good and workmanlike manner.  The failure complained of here was a failure to complete the job.  The appellant does not ask a reduction of the tax bills on account of this defect.  It asks them to be canceled *in toto,* although the owners of the property are receiving, and hereafter will receive, full benefit of the work.  The only damage which the plaintiff suffered by reason of the delay was the premature accrual of interest on those tax bills.  By the amount of the judgments which the trial court rendered on the several tax bills we are not apprised whether that was taken into consideration.

So far as the contract was concerned, the work was complete at the time the tax bills were issued.  The sewer was not usable at that time, not because it was incomplete, not because of any failure of the contractor, -but because of unforeseen floods, *vis major.*

The second section was complete before the first section.  The sewer comprising the second section could

not be used until the first section, next the river, was completed. Suppose different contractors had built the two sections. The second section having been completed, could it be said that the tax bills, because issued before the first section had been completed, must be held null and void and the contractor refused his pay? In a like manner, could it be said that the contractor for the first section, after he completed his work, must lose his compensation because the city should see fit to delay, or find it impossible at once to perform, some work which would make the entire scheme usable?

These questions are answered in the case or Porter v. Paving & Construction Co., 214 Mo. l. c. 17-18. The court in holding the tax bills valid, said: "The sewer was completed as a sewer; it was not usable because of the failure of certain connections."

Appellant attempts to distinguish that case, but the principle is the same as here.

The appellant complains that the city should not have been burdened with the payment of the cost of completing the sewer. It is sufficient to say that the plaintiff is not suing as a general taxpayer; he is suing to cancel certain tax bills on his property, and all the work that was performed by the city relieves the plaintiff of his proportion of that cost which would have been added to his tax bill.

The judgment is affirmed. *Graves, C. J., Woodson, Ragland, Walker* and *David E. Blair, JJ.,* concur; *James T. Blair, J.,* not sitting.