THE STATE EX REL. GEORGE O. CARPENTER ET AL. V. CITY OF ST. LOUIS ET AL.—2 S. W. (2d) 713.

Court en Banc, January 18, 1928.

*Caulfield & Bartlett, Nagel & Kirby* and *Everett Paul Griffin* for relators.

878

*Julius T. Muench* and *Charles J. Dolan* for respondents; *Lambert E. Walther* of counsel.

882.

WHITE, J.—The relators filed their petition in this court, asking for an alternative writ of mandamus directed to various officials of the city of St. Louis—the Mayor, Comptroller, members of the City Council and of the several boards holding the several positions mentioned—respondents here. An alternative writ was issued June 22, 1927. Respondents presented their return, to which relators filed reply. Later the parties filed in this court a stipulation, leaving no dispute as to the facts.

The purpose of the suit is to compel the proper authorities to levy a tax to support the Free Public Library of the city of St. Louis, or for such support to appropriate money levied for general purposes.

The manner of levying and collecting general taxes for the city, the duty of making such levy, prescribed by law, and the official status of each respondent is admitted in the return as averred in the petition. The alternative writ, in accord with the petition, commands respondents to repeal Ordinance No. 36004, already passed, levying taxes for city purposes without provision for the library tax, and to do and perform all their several official duties necessary to levy and collect the library tax, according to the law, and place the fund so collected in the hands of the Library Board, "and, if at the time of the service upon you of this writ of mandamus, the period for levying the said library tax shall have passed, or that for any reason it is too late to make such levy and extend such taxes and make out bills therefor before the time fixed by law for such taxes to become payable, then these are to command you without further excuse or delay to forthwith consider and treat the levy of one hundred and thirty-five cents for 'municipal purposes' made by said Ordinance 36004, as including the levy of the said tax of two-fifths of one mill on the dollar for the year 1927, for the 'Library Fund,' and to collect the said two-fifths of one mill tax as and when the same shall become due, for the Library Fund, and to deposit the same in the City Treasury to the credit of the Library Fund, and to keep the same separate and apart from other moneys of such city, and to permit the Library Board to at all time have exclusive control of same, and to permit and cause the Library Fund to be drawn upon by said Comptroller upon the properly authenticated vouchers of the Library Board; and particularly to command (1) the said Assessor to extend such library taxes in the assessment books, and to cause tax bill which shall include the same to be made out and delivered with a duplicate schedule thereof, to the said Comptroller; (2)

the said Comptroller to officially stamp said bills and deliver them with one schedule to the said Collector; (3) the said Collector to collect such library taxes, and daily pay same to the said Treasurer; (4) the said Treasurer to receive such library taxes and keep same separate and apart from other moneys of the city, as the Library Fund, and to permit the said Library Fund to be drawn upon by said Comptroller upon the properly authenticated vouchers of said Library Board; and (5) the said Comptroller to draw upon said fund at any time and from time to time upon properly authenticated vouchers of the said Library Board, and permit said Library Board to at all times have exclusive control of the said Library Fund; or show cause before our Honorable Supreme Court held at Jefferson City on the 2nd day of July, 1927, why you should not do so. Herein fail not at your peril.''

In 1885 the Legislature passed what is termed the Library Act, now Article V, Chapter 60, Revised Statutes 1919, and in 1895 it passed another act, now Article VI of that chapter, making some additions to the law and providing details as to the manner of its operation.

The first section of the Act of 1885 (Sec. 7191, R. S. 1919) provides that when a hundred taxpaying voters of any incorporated city shall petition the mayor and common council for an annual tax to be levied, collected and used for the maintenance of a free public library, then the mayor and common council shall submit the matter to a vote of the people of the city, and if the majority of the votes cast be for the free public Library then the tax shall be levied and collected in like manner with other general taxes and shall be known as the Library Fund.

In 1901 Andrew Carnegie made a proposition to the board of directors of the St. Louis Public Library that he would donate to the city one million dollars on condition that five hundred thousand dollars of the money be used for a main and central library building, and five hundred thousand dollars for branches; and the further condition that the city would secure unencumbered sites for said buildings, and provided for an appropriation of one hundred and fifty thousand dollars annually for the maintenance of the Library System in the city.

A proper enabling ordinance was passed and complete title acquired to two blocks of ground upon which to erect the central building mentioned, certain interests in which were bought for $280,000, which sum except $45,000, was donated by private individuals. Andrew Carnegie gave his approval of the site.

An election was held April 2, 1901, in the manner prescribed by the Library Act, which resulted in a vote in favor of a tax of two-fifths of a mill on the dollar, annually, for the Free Public Library.

Whereupon Rolla Wells, then Mayor, and Charles W. Bates, City Counsellor, certified the result of the election with assurance to Mr. Carnegie that the tax thus voted is "not subject to repeal by the municipal assembly." A resolution thanking him was passed and thereafter he gave a million dollars to the Library Board.

Certain fiscal features appear in the stipulation. For the year 1927 the expenditures of the city exceeded the receipts by $1,092,655. But at the close of the fiscal year ending April 11, 1927, the national banks of the city were delinquent in several years of taxes, which were contested. Recently the litigation was settled, and said banks paid into the city treasury $1,486,126, on that account.

For the current fiscal year beginning April 12, 1927, the estimated requirement for the Police Department was $5,734,800, of which $600,000 was for a new building; and for all departments other than the Police Department the estimated requirement was $18,834,859, a total of $24,569,659. The estimated revenue for the year, with general tax limit of $1.35 on the one hundred dollars' valuation, was $21,685,000—nearly three million dollars short. The Board of Estimate and Apportionment, in framing its appropriations bill, was obliged to reduce appropriations for the several departments. "But that is usual and has been the situation every year in the past, that the estimate of the department heads exceeded the estimated revenue," adds the stipulation.

The income from the library tax has increased from $149,000 in 1902, to approximately $485,000 for the year ending April 27, 1927. The balance in the City Treasury April 11, 1927, to the credit of the Library Fund, was $285,761.14, on account of library taxes paid for the year 1926, "to be used for library operation from April to December 31, 1927."

The tax rate for general municipal purposes has been increased from 98 cents on the hundred dollars in 1901, to $1.27 in 1926, the rate amounting to eight cents for the Library, Art Museum and Zoological Park.

The return shows that the Board of Estimate and Apportionment submitted and recommended to the Board of Aldermen "a bill establishing the city tax rate for municipal purposes for the year 1927, of $1.35 on the hundred dollars'" valuation, "making no mention of or provision for any tax for the Library Fund," which bill was passed and approved by the Mayor, being Ordinance No. 36004. It is therefore apparent that taxes to the constitutional limit have been levied and are in process of collection.

From the year 1901 until 1926, the officials of the city performed the duties imposed upon them by the Library Act; levied and collected for each year the library tax in the manner provided in the act. But for the year 1927, the Board of Estimate and Apportion-

ment, at the request of the Mayor, secured and received from the City Counsellor a written opinion stating that the statute authorizing and providing for a library tax was in violation of the Constitution; thereupon, professing to act upon said opinion, the Board of Estimate and Apportionment refused to submit a bill providing for the levy of the two-fifths-of-a-mill tax.

Respondents admit all the facts alleged in the petition except that in April, 1921, instead of four cents on the hundred dollars they levied a tax of three and seven-tenths cents. But they aver that in each and every case the levy and collection of the tax was unauthorized, illegal and in violation of the Constitution. They then state their determination never to perform any of the alleged duties enjoined upon them, as aforesaid, with respect to the library tax or Library Fund, and that the city library tax "for the year 1927 shall never be levied or collected as provided in the statute referred to in the petition and alternative writ, and that the moneys received for such library fund shall never be deposited in the treasury of said city to the credit of the Library Fund," etc.

The return then separately, specifically and argumentatively points out that each and every provision of the "Library Act is unconstitutional, unauthorized and inapplicable." The objections urged with persistency and force against its enforcement may be summarized as follows:

That the Library Act (Art. V, chap. 60, R. S. 1919) does not in terms nor by implication apply to St. Louis;

That the taxing power is vested in the city of St. Louis by the Constitution, and it cannot be enlarged nor restricted by any legislative act, for such purpose as a public library;

That a public library is a matter of municipal concern over which the General Assembly has no control;

That the city under its charter powers granted by the Constitution had authority to establish and maintain a public library, but chose to attempt to establish it under a statute which does not apply to it, and the attempt is nugatory. The will of the people was exercised in the wrong manner;

That the Library Act was superseded by the Charter of 1914;

That the Library Act was an attempted delegation of legislative authority to unofficial citizens, contrary to the Constitution, which in case of cities authorized such delegation to municipal authorities only;

That the Library Act is a local law and therefore it invades the charter rights of the city of St. Louis;

That the act authorizes a Library Board, an administrative body, to create a bonded debt;

That the Act of 1921 authorizes the city authorities to decrease or omit the levy;

That the Library Act authorizes a tax for municipal purposes beyond the constitutional limit of $1.35 on the hundred dollars' valuation and is therefore invalid;

That mandamus will not lie to compel the acts commanded in this case.

Some of these objections make war upon each other, as will be seen on consideration. Each of them, with its ramifications, we will consider in its place.

I. The first point made by respondents is that the Library Acts. now Articles V and VI of Chapter 60, Revised Statutes 1919, do not apply in terms to St. Louis, and cannot apply for certain constitutional and formal reasons.

Section 7610, Revised Statutes 1919, providing that all cities containing one hundred thousand inhabitants or more shall be cities of the first-class, is quoted, and authorities cited holding that this classification did not apply to St. Louis and other cities governed by a special charter. Inasmuch as the statute creating in general terms a class of cities containing one hundred thousand inhabitants or more did not include cities of that population operating under a special charter, the inference is, that the general provisions in the library acts could not apply to them.

That would not follow. Chapter 72, Revised Statutes 1919, relating to municipal corporations, including the classification of cities, provides a method by which any city operating under a special charter might be incorporated as a city of the appropriate class under the general law, thus specifically recognizing the special-charter cities as uncontrolled by the general classification.

Section 7191 makes the first act apply to "any incorporated city," and Section 7206, in the second act, applies to "any incorporated city containing over 300,000 inhabitants." Respondents assert that the act is thus rendered unconstitutional as an attempted classification of cities in violation of Section 7, Article IX, of the Constitution, which authorizes cities by general law to be put into four classes; that such classification according to population has been made by the Legislature, the first-class cities including cities of one hundred thousand inhabitants or more, and this law would further divide the first-class cities into two classes. Respondents cite Murnane v. St. Louis, 123 Mo. 479, and Dorr v. St. Louis, 145 Mo. 466. The doctrine announced in those cases has never been followed, but was impliedly overruled in the case of State ex rel. v. Mason, 153 Mo. l. c. 52, and other cases where it was held that a provision applying to cities of three hundred thousand or more was not unconstitutional as being a further classification. Chapter 72, classifying cities, towns and villages, has a number of provisions applying to cities

according to population, without regard to the general division into classes. Many general laws have been enacted and their validity upheld, though made to apply to cities according to the population without regard to the general classification.

Nor is there any merit in the complaint that the Library Law is local and special, as applicable to St. Louis, based solely on the terms of Sections 7206-11, enacted in 1895. Those sections make some changes in the qualifications of the Library Board, and in the details of administering their trust in cities of three hundred thousand inhabitants or more. They are not limited in their application to cities of three hundred thousand *then existing*, St. Louis being the only one. [State ex rel. v. Roach, 258 Mo. l. c. 557.] Even if those sections were void, the essential features of the act remain, and it would not affect the result.

II. But respondents contend further that even if the above objections were removed, the acts could not apply to St. Louis because in conflict with the charter powers of the city.

The argument is that St. Louis derives direct from the Constitution governmental powers superior to those granted any other city, such that the Library Acts confer no authority upon the city which it did not already possess, and to apply it to St. Louis is a trespass upon that city's constitutional preserves.

True, the city of St. Louis is vested with certain powers derived directly from the Constitution. [Withnell v. Ruecking Const. Company, 249 U. S. 1. c. 69-70.] Certain sections of the Constitution apply to such charters, viz., Article IX, Sections 16 and 17, relating to cities generally, other than St. Louis, and Sections 20 and 25, relating to St. Louis. In those sections of the Constitution no terms precisely define the power granted to the cities in making their own charters. Section 17 makes some provision for the form of government of other cities, and the adoption and revision of charters. The clause referring to the power of cities generally appear in Section 16, saying that any city of more than a hundred thousand inhabitants "may frame a charter for its *own government.*"

Section 20 authorizes the city of St. Louis, by a vote of the people to adopt a scheme for the adjustment of its relation to the county, "and the government of the city thus enlarged, by a charter." That section, and Section 22, relating to the amendment of the charter, provide that "such charter shall be (become) the organic law of the city."

A great deal of argument is expended upon the significance of the phrase "the organic law," as if it acquired special significance in the case of St. Louis. Some *obiter* statements in early decisions

not followed later, as will be noticed below, furnish text for the argument. But it is no more comprehensive than the phrase "its own government." It necessarily applies to other cities operating under special charter, and with equal propriety to cities organized and classified under the general law. Each special charter and the law of each city's class is that city's "organic law," bearing about the same relation to its ordinances that the State Constitution bears to the statutes. It means that the authority of the city government and the exercise of municipal functions are subject to and controlled by that charter, which specifies and limits such authority and functions. The charter is adopted by the people and the city officials are controlled by it.

True, the charter of St. Louis has the force and effect of a statute, but that is equally true of special charters of other cities and is of no more force than the general statutes relating to classified cities.

Nor, is it true, as contended, that St. Louis alone has power to amend its charter, for such power is expressly given by Section 17, Article IX, of the Constitution, to any other city which adopts a special charter for its government under that section.

No provision of the Constitution has been pointed out which distinguishes St. Louis from Kansas City, and other cities operating under special charters, or which gives it more powers, or more relieves it from the restraints of general statutes. Just the contrary is expressed in the Constitution.

For instance, Section 16, Article IX, which authorizes special charters provides: "But such charter shall always be in harmony with and subject to the . . . laws of the State."

Section 23, relating to St. Louis, provides: "Such charter and amendments shall always be in harmony with and subject to the Constitution and laws of Missouri," except that gradation may be provided for taxation for *city purposes* in portions of the city included by an enlargement of its boundaries.

Then Section 25, Article IX, follows: "Notwithstanding the provisions of this article, the General Assembly shall have the same power over the city and county of St. Louis that it has over the other cities and counties of this State."

If we are to construe the Constitution as it reads, St. Louis is subject to legislative control in general, just as other cities are. Section 25 was intended to remove all doubt of that.

This court in many instances has held invalid municipal measures of St. Louis which were inconsistent with general laws. [City of St. Louis v. Dreisoerner, 243 Mo. 217, l. c. 223; State ex rel. Knese v. Kinsey, 314 Mo. 87.] Some other rulings of this court throw further light upon the subject. The case of State ex rel. Garner v. Mo. & Kan. Tel. Co., 189 Mo. l. c. 99, was a proceeding by mandamus

to compel the Telephone Company to furnish service under an ordinance fixing a maximum rate, and it was held that to Kansas City had not been delegated the power under its charter to *fix* such rates. General observations of the court are pertinent here:

''There are governmental powers the just exercise of which is essential to the happiness and well being of the people of a particular city, yet which are not of a character essentially appertaining to the city government. Such powers the State may reserve to be exercised by itself, or it may delegate them to the city, but until so delegated they are reserved. The words in the Constitution, 'may frame a charter for the government,' mean may frame a charter for the government *of itself as a city*, including all that is necessary or incident to the government of the municipality, but not all the power that the State has for the protection of the rights and regulation of the duties of the inhabitants of the city as between themselves. *Nor does the Constitution confer unlimited power on the city to regulate by its charter all matters that are strictly local, for there are many matters local to the city, requiring governmental regulation, which are foreign to the scope of municipal government.* In none of the cases that have come before this court bringing into question *the charters of St. Louis and Kansas City* under the Constitution of 1875, have we given to this constitutional provision any broader meaning than above indicated.'' (Italics ours.)

No distinction is made between St. Louis and Kansas City regarding charter powers. Further in the same opinion (1. c. 102):

''The constitutional grant of power under which the charter is formed says that it must always be subject to the Constitution and laws of the State, which we interpret to mean that in all matters not appertaining to *city government* the charter is subordinate to the will of the General Assembly.''

The term ''city government'' is thus interpreted to mean the government framework and functions of which are set forth in the charter. Thus the independence of the city from legislative control is limited to strictly municipal matters.

That broad statement, however, may be qualified. The city's charter powers are not limited to its mere corporate functions. Between that narrow field and territory occupied by general legislation is ground upon which the city under its charter powers may venture if it sees fit, but not contrary to general law, even though its action is only local in its effect. Whether the Library Act is one of exclusive state concern or a matter of permissive charter regulation does not concern us at this point. The people of the city did not in their *charter* provide for the maintenance of a public library, but for that purpose adopted the State law.

III. Yet respondents boldly contend further and specifically that the sole power to *levy taxes* is derived by St. Louis from the Constitution; that the General Assembly could not delegate any taxing power to St. Louis while it might do so to other cities and to counties; that the power to establish and maintain by taxation public libraries, was already "full and ample" under the Charter and the Constitution.

In the solution of the exact question thus raised, it becomes necessary to reexamine the limitations upon the taxing power of the General Assembly; to determine to what extent and for what purpose it may exercise control over the city of St. Louis in respect to taxation; to see whether the proposition of respondents, if given effect, does not read out of the Constitution Section 25, Article IX, quoted above.

Sections 1 and 10, Article X, of the Constitution, are pertinent:

Sec. 1. The taxing power may be exercised by the General Assembly for State purposes, and by counties and other municipal corporations, under authority granted to them by the General Assembly, for county and other corporate purposes.

"Sec. 10. The General Assembly shall not impose taxes upon counties, cities, towns or other municipal corporations or upon the inhabitants or property thereof, for county, city, town or other municipal purposes, but may, by general laws, vest in the corporate authorities thereof the power to assess and collect taxes for such purposes."

It is well to keep in mind that a municipal corporation may be considered in two aspects: that which relates to its corporate functions only, and that in which it discharges certain governmental functions, police powers delegated to it. [Healy v. Kansas City, 277 Mo. 1. c. 626.] Matters of purely municipal corporate concern a special charter may control, and it may not be amended by a special law, though it must be in harmony with the general law where it touches upon matters of State policy. [State ex rel. v. Police Commissioners, 80 Mo. App. 1. c. 206, cited and approved by this court in State ex rel. v. Jost, 265 Mo. 1. c. 72.]

Besides the mere corporate functions of a city there are matters governmental in character, over which it exercises authority delegated to it, in the case of special charter by the Constitution, and by the Legislature in the case of cities organized under a general law. [Kansas City v. Oil Company, 140 Mo. 1. c. 466-67.] But many such functions are of State concern, though local in their operation, and over them the State retains control. In 1 Dillon on Municipal Corporations (5 Ed.) sec. 301, the principle is stated thus:

"Many of the powers exercised by municipalities fall within what is known as the police power of the State, and are delegated to them to be exercised for the public good. . . . Laws and ordinances

894

relating to the comfort, health, convenience, good order, and general welfare of the inhabitants are comprehensively styled 'Police Laws or Regulations.' ''

All legislative power, subject to certain limitations, is granted to the General Assembly by Section 1, Article IV, of the Constitution. Yet it is held that the power to levy taxes is inherent in the legislative body, independent of any constitutional grant; it is absolute and uncontrolled except as *specifically* limited in the Constitution. [Glasgow v. Rowse, 43 Mo. l. c. 489; In re Sanford, 236 Mo. l. c. 684.] Article X of the Constitution fixes certain restrictions upon the method of imposing taxes, the agencies by which it is done, and the subjects of taxation. Section 1 of that article, providing that the General Assembly may exercise the taxing power for state purposes, adds nothing to the inherent legislative authority.

The latter part of Section 1, providing that counties and other municipal corporations may exercise the taxing power ."under authority granted them by the General Assembly for county and other corporate purposes," might be construed to limit the delegation of such taxing power to such purposes only, the General Assembly retaining the power to tax for all other purposes. But the Constitution-makers, in order to remove all doubt about that, provided in Section 10, Article X, that the "General Assembly shall not impose taxes upon . . . cities, . . . or upon the inhabitants or property thereof, for . . . municipal purposes," but may by general laws vest such power in the corporate authorities thereof.

This limitation means, if anything, that the Legislature cannot impose upon a city taxes for that city's own special purposes, but must authorize the city to do so by general law. What it may thus empower a city organized under the general law to do, St. Louis is empowered to do under its charter. A city is given authority, which the Legislature may not exercise for it, to impose taxes for *municipal purposes*. The limitation upon the taxing power of the General Assembly in that respect goes so far and no further.

Respondents' argument assumes that there is a further limitation upon the General Assembly in respect to St. Louis, implied in the grant of power to frame a charter for its own government. We are cited to no authority holding that by *implication* the inherent powers of the legislative body may be so limited. On the contrary, such limitation must be "specified" as stated in the Glasgow case, supra. That being so the General Assembly may impose upon St. Louis, and upon the inhabitants and property of St. Louis, taxes for other than strictly municipal purposes.

The assumption of respondents that the General Assembly is implicitly limited in imposing taxes upon St. Louis, arises from the implication of power in the city to impose taxes. The constitutional grant of power to a city of a certain population to "frame a charter

for its own government," implies that such a city may impose taxes, but it does not follow that such taxing power is unlimited, as counsel seem to contend. That is, the implication of taxing power in the city of St. Louis does involve an implied limitation of control by the General Assembly. The inherent powers of that body are restrained, not by implication but by *specific* limitations in the Constitution; by Section 10, Article X, it cannot impose taxes upon cities or the inhabitants or property thereof *"for municipal purposes."* In that important particular the Constitution preserves to cities, counties and school districts the right of local self-government, and the courts are careful not to restrict that right by construction. Otherwise, for other purposes, the authority of the General Assembly, in that respect, is unlimited, and that applies to St. Louis as well as to other cities, counties and towns. The specification in Section 10 makes no exceptions, and nothing elsewhere in the Constitution expresses or implies further limitation of legislative authority in regard to St. Louis. If Section 25, Article IX, means anything, it means that St. Louis, in the matter of imposing taxes, is subject to the same control as other cities are.

The cases construing the police laws are in point. The State has authority to provide by general law for the establishment of a metropolitan police force in a city operating under a special charter and compel the city to maintain it by taxation. The right of the General Assembly to do that was once questioned with exactly the same argument presented here. The decisions which settled that question show no distinction in principle between those several statutes and the Library Act. In State ex rel. v. Mason, 153 Mo. 23, it was held that the city of St. Louis could be compelled by mandamus to pay the expense of the police system of that city, established by an Act of the Legislature. It is significant that the original legislative act supplanted the municipal system which had existed prior to that time (Id. l. c. 32). The opinion written by Judge GANTT, referring to earlier cases, says at page 47:

"The power of the Legislature to provide the necessary agencies to perform the high functions of the State in the preservation of the public peace, . . . and to impose the duty of paying therefor on the locality for which such agencies were created, was fully and firmly established."

In State ex rel. v. Jost, 265 Mo. 51, this court had under consideration the statute providing for the maintenance of a metropolitan police force as applied to Kansas City, governed by a special charter. The opinion written by Judge GRAVES quotes copiously from the opinion in the Mason case, from the opinion of Judge ELLISON in State ex rel. v. Police Commissioners, 80 Mo. App. 206, and thus comments on the power of the State in such matters, at page 72:

"While much important governmental power concerning matters of strictly municipal or local concern may be legally embodied in the charter, yet the charter must remain in subjection to the general law. This is constantly iterated by the Supreme Court in what are known as the Park cases." And further (l. c. 73) : "In respect to all matters involving the relation of the city to the State and the full exercise of what is commonly known as the police power of the State, the act of the Legislature will annul the provision of such a charter on the same subject."

Respondent argues that by the Constitution St. Louis was authorized not only to frame a charter, but to amend it and therefore it had authority to provide for a library.

The question whether the Legislature had a right to take away authority which the city had already exercised, does not arise in this case, because the Library Law was enacted in 1885 and in 1895; St. Louis adopted it in 1901, and adopted a new charter in 1914. As to that the opinion in the Jost case says, at page 76:

"There is a law of the State which covers this governmental question of State interest, and it makes no difference whether such law antedates the city charter or not, such charter must give way to the general law."

No provision of any charter can exist regarding matters of State concern whether antedating or postdating a general law covering the same matter.

As to how all the money raised by taxation shall be spent, the opinion in the Jost case says, at page 73:

"There are a number of illustrations of these general statements. Thus there was a conflict between the general law and the charter of St. Louis as to the method of extending taxes, and it was held that the charter must give way." And further: "The same recognition of the rule that special charters like those of Kansas City and St. Louis are subject to the general law of the State is found in numerous other cases." [Citing cases.] See also City of St. Louis v. Meyer, 185 Mo. 583.

Respondents cite a number of cases in support of their position, but they must be considered with reference to the particular matters decided.

The first case cited is City of St. Louis v. Sternberg, 4 Mo. App. l. c. 456, where the St. Louis Court of Appeals had before it the validity of an ordinance assessing a license tax upon lawyers. Judge BAKEWELL, who wrote the opinion, delivered himself of an *obiter* statement that "no legislative provision giving any power of taxation to the city of St. Louis has been made, or, as far as we can see, can be made under the Constitution." This court reversed the judgment of the Court of Appeals but approved that statement of the law. [69 Mo. 289.]

If that pronouncement in the Sternberg case should be understood to deny the right of the State to enact any law affecting the power of taxation in the city, for purposes local but not strictly municipal, then it is contrary to the later rulings in the Jost case and the Mason case, supra.

The case of St. Louis v. Dorr, 145 Mo. 466, is cited. There the court had under consideration an ordinance passed under a general act of the Legislature, relating to cities having a population of three hundred thousand inhabitants or more, providing for the establishment and maintenance of boulevards and certain restrictions on building such boulevards. It was held that a boulevard ordinance could not be upheld as an amendment to the charter of the city of St. Louis. But this court said, at page 479:

"It may not always be easy to determine what subjects are local and municipal, and what are not. . . . But it is easy to determine in this case that the Boulevard Act deals with a subject of strictly municipal concern." And in regard to Section 25, Article IX, of the Constitution (1. c. 480): "But the terms of that section certainly do not imply that the General Assembly is to have any greater power over the city and county of St. Louis than it has over other cities and counties of the State." And again (1. c. 482): "The General Assembly has, furthermore, undoubted power to legislate for St. Louis, as for all other cities in the full exercise of the police power of the State, as well as to enforce direct mandates of fundamental law by appropriate statutes and to pass all proper laws that are general throughout the State."

That statement is contrary to respondents' contention here.

In State ex rel. v. Mason, 153 Mo. 1. c. 50, quoting from State ex rel. v. Field, 119 Mo. 1. c. 614, it was said:

"We deem it within the power of the Legislature to impose a tax upon a particular subdivision or municipality of the State, when, in its judgment, it is for the benefit of that locality, as well as the State at large" citing State ex rel. v. Board of Education, 141 Mo. 1. c. 50, and State ex rel. v. Owsley, 122 Mo. 68. That was made to apply to St. Louis.

IV. It is contended that a public library is a matter of purely local concern over which the General Assembly has no control.

Police power is defined as "the power inherent in a government to enact laws, within constitutional limits, to promote the order, safety, health, morals and general welfare of society." [12 C. J. p. 904.]

"General welfare" is a comprehensive phrase and includes education among the concerns of police power (Interstate Consolidated St. Ry. Co. v. Commonwealth, 207 U. S. 79; Barbier v. Connolly,

113 U. S. 27), and a public library is an educational institution. [Brooks v. Schultz, 178 Mo. 1. c. 228.] Can the State enforce a general law, made applicable to a city when adopted by a vote of the people of that city, the purpose of which is the maintenance of an educational institution, not a school? The question contains its own answer.

The State may concern itself with any educational enterprise. State ex rel. v. St. Louis, 241 Mo. 231, was a proceeding by mandamus to compel the officials of the city of St. Louis to levy a tax for the Art Museum as authorized by the Act of 1907, which provided for the establishment of art museums in cities of four hundred thousand inhabitants or more. A peremptory writ was ordered. Judge LAMM, in writing the opinion, declared (at page 248) that the legislative purpose was to enable cities of a certain class to establish, maintain, extend and regulate museums of art as an *educational effort*. The Legislature was assuming authority to promote education in localities throughout the State by means other than through the instrumentality of schools. The act was held valid as affecting St. Louis.

Respondents try to meet the effect of that ruling by saying that the only point decided was whether a previous case involving the same matter (216 Mo. 47) was *res adjudicata*. In that earlier case a writ was denied on the ground that the money provided for was to be turned over to a private institution, a subordinate body of Washington University, and therefore the validity of the Museum Law was not determined. Yet, in the later case this court could not have ordered a peremptory writ except upon determination that the law was a proper exercise of legislative authority. Judge LAMM said in the opinion, at page 237:

"The city and its mayor admit the passage of the law, the election, the result, the demands and their failure, and that relief is due in the form prayed *unless the law is worthless because of invalidity.*" That was the issue. And further on the same page this was said: "The question then is, is the Act of 1907 constitutional? Plaintiffs affirm and defendants deny that it is."

The opinion then points out that the constitutionality of the act was not settled in the prior case, but was still open. The act was then held constitutional; that was the principal point discussed in the last part of the opinion.

If a public museum is an educational institution in which the State is concerned and over which it may exercise control in St. Louis, then certainly a public library, *a fortiori*, is likewise an educational institution over which the State may exercise local control. That schools and their maintenance are separately provided for in the Constitution does not affect the question. Education is not limited to schools and it is within the control of the General Assembly, in

the exercise of the State's police powers, to provide for other educational agencies.

The respondent cites the case of Brooks v. Schultz, 178 Mo. 222, a case arising in Cape Girardeau, construing the Library Law. That case will be considered below in the discussion of another point. The court did not there hold the Library Act unconstitutional, but indicated the contrary, and held the tax improperly levied. It was not the law, but the levy, that was invalid.

As a State policy the General Assembly has assumed control of public free libraries as educational institutions. That is a legislative determination that they are a matter of State concern. It must be borne in mind that the taxing power of the General Assembly is limited only by municipal corporate purposes. The respondents themselves concede that free public libraries do not come under that head, for they have levied to the constitutional limit for municipal purposes and omitted the library tax because they say it is not in that class. They claim the maintenance of the library is within the exclusive charter powers of the city, because such powers go far beyond the mere municipal corporate affairs, a position which we have shown above to be erroneous. That being so, the power of the General Assembly to control the establishment and maintenance of them is unrestricted, and that power has been exercised in the enactment of this local option law.

It is possible that the people of St. Louis thought that the money expended in the maintenance of free public libraries, by promoting good citizenship, would save expense in the police department.

V. Respondents argue that the charter adopted in 1914 superseded the Library Act which the voters had previously adopted because general provisions in that charter may be construed to authorize the maintenance of a public library. Of course, it could not supersede the Library Act unless that act had been in force in the city. The word "supersede" is taken from Section 22, Article IX, of the Constitution, which provides that a new charter will supersede an old one. Nothing is said about a new charter superseding any general law. It only supersedes measures embodied in the original charter. Apply that expression to the situation here as respondents desire and it becomes an euphemism to soften the blow directed at a legislative act. It means, if respondents are right, that St. Louis, by adopting a new charter, can *nullify* a state law. So, if the Library Act was applicable to St. Louis, which this argument necessarily concedes, it was so by reason of its being a matter of State concern over which the General Assembly has control. Thus the argument refutes itself. Manifestly, if the Library Act applied to St. Louis when adopted in

1901, then the charter later adopted was subordinate to it, or else the constitutional provisions first quoted have no effect.

If the argument of respondents is sound, St. Louis (always contending for Home Rule) might shake off its legislative shackles by a single act of supersession, that is, by amendment to its charter, so as to establish control and maintenance of its own appointed police system. If the Library Act may be nullified by supersession, so may the law relating to police control. Section 7191 provides a way by which the city may remove itself from the operation of the act, *by vote of the people*, not by official nullification. The people of the city have not seen fit to abandon their public libraries.

We have already considered what is meant by "matters of purely municipal concern." In State ex rel. v. Jost, 265 Mo. l. c. 74, quoting from the Kansas City Court of Appeals in the Police Commissioners' case, supra, it was said:

"That the charter cannot change the State law in this respect is apparent, unless we set up the charter as superior to the State law. To grant such potency to the charter we would be brought to the position, as stated by the Supreme Court, that the power of appointment could be taken from the Governor and vested in some city functionary. And furthermore that a wholly different system of police could be introduced by the city, or indeed none at all; and thus the policy of the State be subverted."

VI. It is asserted and argued at length that the Library Act is unconstitutional for reasons in addition to what has already been said. The point is this: The Constitution limits the right of taxation in the city of St. Louis to $1.35 on the hundred dollars, for city and county purposes. If the Library tax is a matter of State concern, then it is not an establishment for city or county purposes, and therefore it cannot be included in the $1.35, unless perchance the city should make it so by virtue of the power invested in it by its charter, and the city has not seen fit to do so. The Library tax is in addition to the $1.35 on the hundred dollars allowed by Section 11, Article X, of the Constitution, and therefore is unconstitutional and void.

In this connection it is argued that Section 7191 of the Act itself shows that the intention was to authorize a levy for library purposes in addition to the $1.35, where it provides that the tax "shall be levied and collected in like manner with other general taxes of such incorporated city." No such purpose can be gathered from that language. Taxes are levied and collected in the city, not only for state purposes, but for city purposes, and the Library tax is to be levied and collected in the same manner as other general taxes. That does not mean *in addition* to other general taxes, but it is a part of other gen-

eral taxes. If that expression may be considered ambiguous, then it must be given a construction which will render it constitutional instead of unconstitutional. The act applies to all cities and counties. There is nothing, either in Article V or VI, of Chapter 60, which indicates anything else than that the tax thus required by the Legislature to be devoted to a library is other than a part of the amount within the constitutional limit. St. Louis has always so treated it.

The respondents cite three cases to illustrate their point. The first is Brooks v. Schultz, 178 Mo. 222, where it was held that the tax attempted to be levied under the Library Act in Cape Girardeau, a city of the fourth class, was invalid for the reason that the city had already levied the fifty cent limit provided by the Constitution for such cities, and attempted to levy the Library tax in addition to it, the proposition showing on its face that it was in addition. It must be noted that this court in that case did not hold the Library Act unconstitutional. It said that the Public Library was an educational institution, indicating that it was, therefore, a proper matter of State concern; and then said, at page 226:

"Whilst the city cannot go beyond the limit there named for its general revenue, it may, if the Legislature so authorizes, levy a special tax for a *purpose local to the city but not for city purposes.*" (Italics ours.)

Thus the opinion recognizes that the Legislature may authorize the levy of taxes for the purpose of a library in addition to taxes for municipal purposes, *within the constitutional limit.*

Board of Commissioners v. Peter, 253 Mo. 520, is cited, opinion by Judge LAMM. The matter was an attempt to erect a county hospital in Buchanan County, and a tax for the hospital was held to be invalid because it was in addition to the thirty-five-cent limit on the hundred dollars for county purposes. The act authorizing the tax on its face showed that it must be in addition to the 35 cents allowed the county for general purposes, because the rate was 25 cents on the hundred dollars, which would leave only ten cents for general purposes. The fact that it would take a part of the amount limited in the Constitution did not make the tax invalid, but by taking so large an amount the act showed on its face that it was intended to be in addition to the constitutional limit.

Strother v. Kansas City, 283 Mo. 283, is where a tax for the support and maintenance of the police department of Kansas City was under consideration. The city had levied taxes up to the constitutional limit for municipal purposes, and then levied in addition a two-mill tax for the support of the police department. The plaintiff tendered all except that two-mill tax and brought suit to enjoin its collection, on the ground that it was unconstitutional and in excess of the highest rate of taxation authorized by the charter of Kansas City and by the State Constitution, Sections 11 and 12,

Article X. It was admitted in the answer that this two mill tax was in addition to the constitutional limit for municipal purposes, but the city asserted the right to make such levy, because it was for a state tax for a state purpose. It was held that the tax could not be levied as a state tax, but it was within the power of the General Assembly to create a police system for the city and to lay upon the property of the city the burden of defraying the expense of the system, that a special tax for the purpose could not be levied and such expense must be paid out of the revenue of the city within the constitutional rate limit. [Citing State ex rel. v. Mason, and State ex rel. v. Jost, supra.] The judgment of the trial court in sustaining the injunction was affirmed.

In each of those three cases the city or county attempted to levy a special tax in addition to and outside the constitutional limit, and attempted to do so under a general law applying to such cities. The levy and not the law was held invalid.

The question presented here is entirely different. Here the city authorities deliberately ignored and violated the mandatory statute which had been adopted by the city. In each of those cases the city itself was attempting to enforce an illegal levy which it had made; in this case the city authorities are attempting to avoid a legal levy by absorbing its funds for other purposes. The question is whether the city officials having thus deliberately violated the law may be compelled to observe it.

VII. At the first extra session of the General Assembly in 1921, an act was passed amending Section 7191 of the Library Act. This amendment the respondent interprets to give discretion to the municipal assembly in the matter of levying a tax for public library after the valuation of property for taxation shall have been increased. We find it unnecessary to consider a construction of that act.

The stipulation signed by the parties sets out the special message by which Governor Hyde called the General Assembly in its first extra session. That message specifies the subjects and purposes for which the session is called, seven in number, most of them relating to the matter of road bonds and roads. Nothing in that message, of specification of purposes, mentions the Library Act. It is further stipulated that the subject of amending the Library Act was not recommended to the consideration of the General Assembly by any special message of the Governor after the Assembly had been convened in extra session, so far as disclosed by any record or journal of either house of the General Assembly.

Section 55, Article IV, of the Constitution, provides that the General Assembly, when convened in extra session by the Governor, shall

have no power to act upon subjects other than those specifically designated in the proclamation by which the session is called. or recommended by special message to its consideration by the Governor after it shall have convened.

That section of the Constitution is held in recent decisions, to be mandatory. [State ex rel. Rice v. Edwards, 241 S. W. 945, l. c. 948; Ex parte Seward, 253 S. W. 356, l. c. 357.]

Plainly, then, under the facts agreed upon, the Legislature in that special session had no power to amend the Library Act, and therefore the Act of 1921 is unconstitutional.

It may be said here that the Library Act does not attempt to abridge the right of local self-government, but strengthens it by adding an instrumentality for its realization. It permits the *people* by their vote to determine its adoption, while the Act of 1921, as construed by respondents, takes that power from the people and lodges it in the municipal assembly and the mayor.

VIII. Respondents argue the proposition at length that the Library Act is unconstitutional, because it is an attempted delegation of legislative authority. Section 7191 of the act provides that when one hundred tax-paying voters of an incorporated city shall petition the mayor and the city council asking that a tax be levied for the establishment and maintenance of a free public library, etc., ''and shall specify in their petition a rate of taxation . . . in cities of over one hundred thousand inhabitants not to exceed two-fifths of one mill annually [on the dollar] on all taxable property in the city, such mayor and common council shall direct the proper officer to give notice in his next legal notice of the annual election, or special election, which may be called for the purpose of voting on such question, that at such election every voter may vote ''for a — mill tax for a free public library,' or 'against a —— mill tax for a free public library,' specifying in such notice the rate of taxation mentioned in said petition,'' etc. The adoption of the law then is determined by the vote cast at the election.

Respondents make the point that it is the hundred tax-paying voters who are authorized by the act to fix the tax rate. They ''specify in their petition'' the rate ''not to exceed'' two-fifths of one mill. They, therefore, are given discretion to determine within that limit what the Library tax shall be. The mayor and common council then ''shall direct the proper officer'' to give notice of the election, ''specifying'' the rate ''mentioned in the petition.'' They argue that the act thus gives no discretion to the mayor and common council, who are authorized by the Constitution to receive delegated legislative power. They ''shall'' cause notice of the election, ''specify-

ing" . . . "the rate of taxation mentioned in the petition." They perform only a ministerial duty in submitting the matter, to a vote.

The rule is without exception that the legislative power vested in the law-making body of the State cannot be delegated. Yet, under modern conditions, in the many ramifications of modern life in which affairs are brought under legislative regulation, the necessity of conferring upon administrative bodies and officers the authority to ascertain facts, or perform conditions, under which a law may be brought into effect, are so numerous and varied that the difficulty is not in announcing the principle that legislative power may not be delegated, but in the application of the rule to specific cases. Among the legislative powers that may not be delegated is the power to assess taxes except in the manner authorized by the Constitution.

If the act must be construed as the respondents contend, it is unconstitutional. But if we can determine that the Legislature itself fixed the rate of taxation in the act, or that the mayor and common council, to whom legislative authority may be delegated, had any discretion in fixing it, then the act is not open to that objection.

It is well established that a law may be enacted by the Legislature to take effect upon the happening of a contingency, such, for instance, as the vote of the people in a district to be affected by the law. [12 C. J. 866.] All local-option laws must be initiated in some manner. It is not necessary that they should be initiated by bodies which have delegated legislative authority. In many instances it is important that they be initiated by citizens. Such, for instance, are the laws restraining stock, relating to road districts, drainage districts and the like; particularly road districts provided for in Article 7, Chapter 98, Revised Statutes 1919, where the roads are paid for out of the general tax and not by special assessments. It is held in State ex rel. Maggard v. Pond, 93 Mo. 606, l. c. 621, that it is not the vote of the people that makes the law; but that the law authorizes the vote, that the vote is the means or the contingency upon which the law is put into operation. It was further held that a local-option law, like the liquor law, was not, as respondents contend, a special, but a general law.

This question may be viewed from several angles:

(a) Can it be said that the General Assembly did not fix the rate in the act? Does the mere fact that the statute provides a rate of taxation "not to exceed two-fifths of one mill annually," etc., compel the construction that the lawmakers did not determine the rate when they enacted the law? It is a cardinal rule of construction that a statute will not be held unconstitutional if reasonably it can be construed in a manner to make it constitutional. If the Legislature had fixed definitely "two-fifths of

a mill on the dollar," instead of using the words "not to exceed" there would be no objection to the law as a delegation of legislative authority. It would confer upon the people of the city of St. Louis the right to burden themselves with a tax to that amount if they see fit to do so and expressed their desire by popular vote. If the Legislature had no authority to give them discretion to adopt a lower rate, or to waive their right to have the full rate assessed, then that part of the act which gave them such discretion could be held unconstitutional, erasing by construction the words "not exceeding."

Suppose the act had provided a definite rate of two-fifths of one mill on the dollar, and added the proviso that if the petitioners saw fit they might in their petition specify a lesser rate. We might easily say the proviso was an unauthorized delegation of authority, and the rate named was the only one which was authorized. Is there any difference between a statute so framed and this one with the words "not to exceed?"

In State ex rel. v. Mason, supra, the act under consideration authorized the police commissioners, an administrative body, to appoint *not less* than 850 patrolmen and 250 probationary patrolmen. The number appears as a maximum limit. The creation of the offices is a legislative act and cannot be delegated to an administrative body. It was held in that case that the numbers mentioned were fixed by the law and the commission could not appoint any more, except in case of emergencies provided for in the act. This, notwithstanding the use of the words, "not less than;" which seemed to imply that more could be appointed. Under that authority we may say that only one rate was mentioned in the Library Act, and when the petition mentioned that rate, the question whether the petitioners had discretion to name a lesser rate in their petition does not arise. Except the words "not to exceed," there is nothing in Section 7191 to indicate that the petitioners had any authority to "specify" any lesser rate than two-fifths of a mill. The words "a rate" are used instead of "the rate," but that did not signify discretion to choose a rate, because several rates are mentioned in the section as applicable to cities according to population.

(b) But, for the sake of the argument, suppose the statute be construed to allow the petitioners a choice of rates, two-fifths mill or less: is it necessary to interpret it to mean that the Legislature did not in fact fix the rate? In many instances it is held to be not a delegation of legislative authority to fix certain limits within which judicial or administrative bodies may act. For instance, definitions of crime and the fixing of punishments is the exercise of purely legislative functions which cannot be delegated. Yet where the statute fixes the punishment for crime within definite limits, the court or jury have discretion to assess

punishment within those limits. It is not a legislative act. In State ex rel. v. Jost, 265 Mo. 1. c. 77, the statute which the court had under consideration provided that the police board might appoint officers and patrolmen *not exceeding* certain number for each district, and limited in some respects by the population. The board of police commissioners, a mere administrative body, had authority to determine the population and the number of police districts, which would necessarily vary the maximum limit. *There was no minimum limit;* the commissioners had the discretion to appoint a less number if they saw fit. The act was held constitutional.

Here we have a tax rate with a maximum limit fixed by the Legislature to be imposed upon a contingency, a vote of the people of the city who pay the taxes. As the law reads, it does not leave to the petitioners unlimited discretion to *fix* the rate, but merely a choice between rates fixed by the Legislature. Is it not entirely permissible for the Legislature to enact a local-option law giving the people of a locality the right to secure its benefits with the privilege of supporting it by one tax rate or another, provided in the law? The necessity of leaving to administrative boards and other agencies the authority to put into effect certain laws upon certain definite conditions makes it more and more necessary for legislative acts to provide more variety of conditions under which the law may be put in operation in different localities. It is an effort to provide methods of permitting home rule in accordance with the will of the people of localities. If punishments for crimes may be fixed within definite limits by a court or jury at their discretion; if the creation of offices, strictly a legislative function, may be conferred on administrative boards within definite limits, then may not a tax rate within a definite maximum limit, fixed by the Legislature, be chosen by a vote of the people particularly concerned?

(c) Even if the statute should be construed to mean that the General Assembly did not fix the rate in the act, it would not necessarily follow that it attempted to delegate that function to the hundred petitioners.

This question arose in regard to the charter powers of St. Louis, in Haeussler Investment Company v. Bates, 306 Mo. 392, where the charter provided that a sewer district might be laid off by the municipal assembly, but only on the recommendation of the board of public improvements, a mere ministerial body. It not only originated the scheme for establishing the district, but the municipal assembly had no authority to amend the bills which the board recommended. This court held that the charter provision was not an attempt to invest the board of public improvements with legislative authority, but the provision was only a limitation upon the authority of the municipal assembly. The same was held in the case of Brown v. Phillips, 254 S. W. 1. c. 702, and in Findley-Kehl Inv. Co. v. O'Con-

nor, 226 S'. W. 1. c. 800. It was pointed out that the municipal assembly had discretion to accept or reject the recommendation of the board of public improvements, and therefore did in fact establish the district.

So we may say here that when the petition of the hundred citizens was presented in 1901, the mayor and common council had discretion to accept or reject it, and refuse to submit the matter to a vote, or to submit it at a lower rate.

But respondents call attention to the language of Section 7191, that "such mayor and common council *shall* direct the proper officer to give notice" so as to submit the matter to a vote, specifying the rate mentioned in the petition. The word "shall," when used in a statute, is often construed to mean "may." It is imperative where the public or persons have rights which ought to be exercised or enforced. But where no right or benefit depends upon its imperative use, it may be held directory only. [2 Lewis-Sutherland on Statutory Construction, sec. 640.] The word is held to be permissive and not mandatory when necessary to sustain or accomplish the purpose of a legislative act. [People v. Fox, 129 N. Y. Supp. 1. c. 651.] "Shall" is also construed in the permissive sense to mean "may" where it is necessary to sustain the constitutionality of a statute. [Spring Creek Dist. v. E. J. & E. Ry. Co., 249 Ill. 1. c. 294.] Courts many times have construed the word "shall" to mean "may" under circumstances where it seemed consistent with the legislative intent. With that construction the mayor and common council had discretion either to deny the petition or to submit the proposition to a vote. Having that discretion it was the mayor and common council which fixed the tax rate when they ordered the election, the rate to go into effect contingent upon a favorable vote.

IX. Respondents contend that the Library Act is invalid because it authorizes the board of directors, in violation of the Constitution, to issue bonds and secure the same by deed of trust on any land which it may have. This appears in the Act of 1895, Section 7209, Revised Statutes 1919. Even if respondent is correct in saying that the board of directors would have no right to mortgage the property under its control, acquired by taxation, it would not necessarily render that provision void, because the original act, Section 7199, authorizes the directors to receive donations of personal property and real estate. That is the way the property in possession of the board was acquired, and over it they would have such control as the donor would see fit to grant or the law provides. But even if that portion of Section 7209, authorizing the creation of a bonded indebtedness were held to be null and void, it would not affect the validity of the remainder of the act.

X. Finally, it is contended by respondents that mandamus will not lie. This is put upon the same ground as other objections urged to this proceeding, which have already been considered. It is said that levying a tax is not a ministerial act, and cannot be enforced by mandamus. Respondents here are confusing the imposition of a tax with the levying of a specific tax authorized by law. The former is a legislative act, implying discretion; the latter is merely a ministerial act and may be enforced by mandamus. [38 C. J. 772.] We may concede that the mayor and common council could not have been compelled by mandamus to submit the matter to a vote in accordance with the petition of a hundred citizens, but had discretion to reject it; that it was necessary for the petitioners and the city authorities to agree upon the matters submitted. Yet, after the matter was submitted to a vote and adopted by the people, the law became fixed and the duty to levy the tax was imperative upon the city authorities. The act of making the levy is a ministerial duty imposed by the law. In fact, it has been held that, in a broad sense, a law of that kind is an appropriation. [38 C. J. p. 578; State ex rel. v. Mason, 153 Mo. 1. c. 59.]

Here is a legislative act, imperative in its terms, put in force by the people of the city, which shall remain in force until repealed or modified by the same authority which put it in force, as provided in the act itself. If it had been desired to reduce the rate or abolish it altogether, the remedy was simply to submit the matter to a vote and let the people who adopted it amend or abolish it. But the city officials, the servants of those people, so far as the city of St. Louis is concerned, were not willing to modify or repeal the act in the manner pointed out by the law. They have not, in any regular, authorized, legal way sought to obtain relief from what they claim to be a burden, but, in utter defiance of regularity and a prescribed method, they announce their fixed intention to disobey the specific administrative duty commanded of them by the act.

It is said in the Mason case, supra, at page 51:

"It does not lie in the mouth of the city to plead other obligations as superior to the demands of its creator. It is not for one moment to be presumed that the State which organized and chartered the city will hinder the performance of its duties which the State has imposed upon it; nor can it be tolerated that the city will assume obligations superior to those which the State has declared shall be preferred charges upon its revenues." And further (l. c. 58): "If we are right in our previous declaration that the State in the exercise of a State function can constitutionally require one of its cities, towns or counties to levy and collect a tax to further and support a State purpose in that city, town or county, and may even require such municipality to use revenue collected for one purpose, for a different

purpose, without being amenable to the charge of disturbing vested rights, certainly the Legislature could lawfully make this appropriation directly."

If that can be said of the taxes levied for the purpose of supporting the police force, it can with equal propriety be said with regard to the tax to be collected and appropriated for the support of the library, since there is no difference in principle between the two, so far as the authority of the General Assembly to control the matter is concerned. Nor is it any reason for denying the writ that the recalcitrant city authorities have exhausted the fund or reached the constitutional limit in taxation. [State ex rel. Mulvoy v. Miller, 285 S. W. 504, 1. c. 509.] Nor is it sufficient reason for refusing the peremptory writ that the time is passed for the making of the levy. [United States ex rel. Fisher v. Board of Directors, 229 Fed. (C. C. A.) 1. c. 7.]

Notwithstanding the protest of respondents, there is no other method of maintaining the Library. True, there was, June 11, 1927, a balance in the city treasury to the credit of the Library Fund of $285,761.14, paid in from the taxes for 1926, but to be used for the purpose to December 31, 1927, by which time the sum on hand probably would be exhausted, and the taxes for the year 1927 would be collected and available. They not only have made no provision for the support of the library, but have declared their determination never to do so, and have taken steps to use for other purposes all the taxes to be collected.

They complain that the alternative writ is vague and incoherent, and further that it commands them to repeal an ordinance and re-enact another one making the levy required by the writ. The alternative writ commands the different city authorities named as respondents to perform the several duties necessary to levy and collect the tax, and if at the time the writ shall be awarded it shall appear that the time for levying the Library tax shall have passed, or for any reason it is too late to make such levy, etc., then they are commanded to consider and treat the levy of $1.35 on the hundred dollars already levied and in process of collection to include the levy of two-fifths of one mill on the dollar for the Library Fund and appropriate it for that purpose in the manner prescribed.

There is nothing indefinite about that.

The city authorities no doubt have a right to contest the constitutionality of the law by refusing to obey it, but in doing so they assume the risk which that course involves. They cannot evade the law by the mere expedient of allowing the time to pass in which they may regularly act, nor can they defeat its purpose by attempting to absorb for other purposes the funds which the law requires them to use for this purpose. They say Articles V and VI, Chapter 60, the Library Acts, do not impose upon them the duty to *treat* any portion

of levy for municipal purposes as including the Library tax. The effect of that argument is that any official may nullify any law, which he is sworn to execute, by simply ignoring it. A law does not have to provide details by which it may be enforced. The courts have inherent power to enforce it, and, in case of a plain, ministerial duty such as this, to command official action. The city authorities have provided means to collect the money, they will have it in control; therefore, we can command them to appropriate for the purpose contemplated by the law.

The return shows that the Board of Estimate and Apportionment submitted and recommended to the Board of Aldermen, "a bill establishing the city tax rate for municipal purposes for the year 1927, of $1.35 on the hundred dollars' " valuation, "making no mention of or provision for any tax for the Library Fund," which bill was passed and approved by the mayor. It is therefore apparent that taxes to the constitutional limit have been levied and now are in the process of collection, and the time is passed for making an appropriate levy.

The peremptory writ is therefore ordered, commanding respondents to treat four cents of $1.35 on the hundred dollars' valuation, collected and to be collected, under the levy made, as for the support of the Free Public Library in the manner commanded in the alternative writ.

All concur; *Ragland, J.*, in the result and in all except "C," of Paragraph VIII.